Argued and submitted March 18, 1987, resubmitted In Banc October 5, 1988, reversed and remanded for new trial February 22, reconsideration denied May 12, petition for review allowed June 27, 1989 (308 Or 158)

STATE OF OREGON,
*Respondent,*

*v.*

CHERYL LYNNE AINSWORTH,
*Appellant.*

(85-3451-C-2, CA A41480 (Control))

STATE OF OREGON,
*Respondent,*

*v.*

JOHN AINSWORTH,
*Appellant.*

(85-3452-C-2; CA A41596)
(Cases Consolidated)

770 P2d 58

Robert J. McCrea, Eugene, argued the cause for appellants. With him on the brief was McCrea, P.C., Eugene.

Jonathan H. Fussner, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

BUTTLER, J.

Rossman, J., dissenting.

Deits, J., dissenting.

Riggs, J., dissenting.

## BUTTLER, J.

In these consolidated cases, defendants, husband and wife, appeal their convictions for manufacture and possession of a controlled substance. ORS 475.992. They contend that the trial court erred in denying their motion to suppress evidence seized from their property pursuant to a search warrant based on information obtained without a warrant by police officers who were riding in a helicopter looking for marijuana that they had heard was growing on defendants' property. The question is whether that information was obtained in violation of defendants' privacy rights under Article I, section 9, of the Oregon Constitution. Because the discovery of the marijuana by the police was the result of "a purposive intrusion into defendant's privacy," *State v. Slowikowski,* 307 Or 19, 27, 761 P2d 1315 (1988), for the express purpose of seeking out the contraband on defendants' property, and was not merely an incidental observation made during a routine flight from one place to another, it was a search within the meaning of Article I, section 9. Further, because the search was conducted without a warrant or any exception to the warrant requirement, the evidence so obtained must be suppressed. Accordingly, we reverse.

Defendants live on approximately 14 acres of rural property. The front portion of the rectangularly shaped property is pasture land. The house is situated behind the pasture land on a flat bluff of approximately two acres. The remaining acreage is on an incline to the rear of the house and abuts BLM land. The property is enclosed from behind the house to the BLM line by a four-foot high animal fence topped with two strands of barbed wire. A barn and a poultry pen are in the enclosed area behind the house. There are "no trespassing" signs surrounding the property. The marijuana at issue here, 17 plants approximately five feet high, was growing in plastic buckets about 300 feet from the house. Most of the plants were under two large trees, 45 to 50 feet high, in a generally wooded area. The other plants were nearby among smaller trees. Defendant husband testified that he had placed the plants among the trees so that they would not be seen from the sides of his property or from the air.

Acting on a tip that marijuana was growing in the area of defendants' property, two sheriff's deputies chartered a helicopter with a pilot to scout the area. When the helicopter

arrived over defendants' property, one of the deputies said that he spotted marijuana plants. The helicopter then tilted and circled above the spot three or four times to enable the other deputy to confirm the observation. There was conflicting testimony as to the altitude of the helicopter when the deputy said that he identified the marijuana. The pilot did not testify, and neither deputy was able to testify as to the precise altitude of the helicopter. One estimated that "we were pretty close to four or five hundred feet." Defendants' son estimated that the helicopter was 15 feet above the tallest trees.

Defendants challenge the accuracy of the affidavit on which the search warrant was based as to the altitude of the helicopter at the time of the deputies' observations and also argue generally that there was no probable cause for issuance of the warrant. The challenge to the accuracy of the affidavit is in the nature of a motion to controvert and, pursuant to ORS 133.693(2), defendants have the burden to establish its inaccuracy. ORS 133.693(3). The affidavit stated that the helicopter was at 500 feet.[1] Given our view of the case, however, we do not consider it significant whether the helicopter was less than 500 feet in the air when the deputy said that he saw marijuana plants.

Defendants' general challenge is that the aerial observations constituted a warrantless search that violated their privacy rights and that, therefore, under Article I, section 9, of the Oregon Constitution and the Fourth Amendment,[2] the search warrant based on those observations was invalid.[3] Article I, section 9, protects both property and pri-

---

[1] There is evidence that there was an initial observation, after which the helicopter circled and descended. However, the information in the affidavit purports not to rely on any observations made after the initial one.

[2] The officers' conduct was not a search within the meaning of the Fourth Amendment. *Florida v. Riley,* 488 US ____, 109 S Ct 693, 102 L Ed 2d 835 (1989); *California v. Ciraolo,* 476 US 210, 106 S Ct 1809, 90 L Ed 2d 210 (1986). Both of those cases were decided under the reasonable expectation of privacy analysis that originated with *Katz v. United States,* 389 US 576, 88 S Ct 507, 19 L Ed 2d 576 (1967), which has been rejected in analyzing privacy rights under the Oregon Constitution. *State v. Campbell,* 306 Or 157, 759 P2d 1040 (1988); compare *Oliver v. United States,* 466 US 214, 104 S Ct 1735, 80 L Ed 2d 214 (1984).

[3] Defendants argue that their case can be factually distinguished from three aerial observation cases relied on by the state, in which we held that the evidence need not be suppressed: *State v. Farkes,* 71 Or App 155, 691 P2d 489 (1984), *rev den* 298 Or 704 (1985); *State v. Bruno,* 68 Or App 827, 683 P2d 1383, *rev den* 297 Or 824 (1984); *State*

vacy interests. *State v. Owens,* 302 Or 196, 729 P2d 524 (1986); *see also State v. Dixson/Digby,* 307 Or 195, 766 P2d 1015 (1988). Given our conclusion that defendants' privacy rights were violated, we need not decide whether their property rights were also violated. However, we point out that, at common law, a property owner had a property right upward *usque ad coelum*—to the heavens.[4] With the development of aircraft, it became necessary to make accommodations between the rights of property owners and those engaged in commerce through the airspace. *See United States v. Causby,* 328 US 256, 66 S Ct 1062, 90 L Ed 1206 (1945). It is not necessary here to discuss the various approaches that have been taken to achieve that accommodation; we need only point out that their purpose has been to permit air commerce while, at the same time, to recognize property owners' rights in the airspace above their land. In some instances, the intrusion has been characterized as a trespass; in others it has been characterized as a nuisance. *See Atkinson et al v. Bernard, Inc.,* 223 Or 624, 355 P2d 229 (1960); *Restatement (Second) Torts* § 159 (1965).

■    The point is that the coming of aircraft and their use in commerce has not done away with the privacy right of property owners in and about their property, although it has reduced the extent to which they may exert property rights in the airspace above their land. Generally, people must put up with aircraft flying over their property above the minimum altitudes fixed by the FAA;[5] however, there is no reason related to the accommodation of air travel why they must suffer the intrusion into their privacy that occurs when an aircraft hovers or circles over their property in an effort to

---

*v. Davis,* 51 Or App 827, 627 P2d 492, *rev den* 291 Or 368 (1981). However, *Davis* and *Bruno* were decided under the Fourth Amendment. Although *Farkes* was decided under Article I, section 9, as well as the Fourth Amendment, we made no separate state constitutional analysis. Therefore, those cases, although they may provide some guidance, do not govern our analysis under the state constitution. *State v. Caraher,* 293 Or 741, 653 P2d 942 (1982).

[4] The complete phrase is: *"cujus est solum ejus est usque ad coeleum"*—which, "taken literally, means that he who has the soil owns upward unto heaven, and by analogy, downward to perdition." Prosser and Keeton, *Law of Torts* 79 § 13 (5th ed 1984). *See Butler v. Frontier Telephone Co.,* 186 NY 486, 79 NE 716 (1906).

[5] FAA regulations, designed for safety, do not appear to impose a specific altitude restriction on helicopters. *See* 14 CFR § 91.79(d) (1986). It would be strange, indeed, to define one's privacy rights under Article I, section 9, by administrative regulations. That is particularly true when, as with helicopters, there is no minimum altitude imposed.

scrutinize or spy on their activities on their protected premises. "[T]he privacy protected by Article I, section 9, is not the privacy that one reasonably *expects* but the privacy to which one has a *right." State v. Campbell, supra,* 306 Or at 164 n 1. (Emphasis in original.) Because privacy rights are not confined to defendants' house and its curtilage, *State v. Dixson/ Digby, supra,* we need not decide whether the officers invaded the curtilage.[6]

It is one thing for an aircraft to fly over property at a safe altitude *en route* to a destination at a normal operating speed or at a speed that is necessary to maintain flight, during which some observations might be made of what is on the ground.[7] That such a lawful observation might be made, however, does not mean that the police conduct here was not a search: "Whether police conduct is a search does not turn on whether its object could be discovered by conduct that is not a search." *State v. Campbell, supra,* 306 Or at 166. It is quite another thing when the aircraft hovers, circles or makes numerous passes over the property in a determined effort to observe the property or activities in which the owners are engaged. "A determined official effort to see or hear what is not plain to a less determined observer may become an official 'search.' " *State v. Louis,* 296 Or 57, 61, 672 P2d 708 (1983).

In 1859, when Article I, section 9, was adopted, there can be no doubt that occupying the airspace over a person's property was a trespass, an unprivileged entry, although the framers could not then have foreseen that persons would be able to put themselves in that position. In *Campbell,* the court pointed out that, since 1859,

> "the government's ability to scrutinize the affairs of 'the people' has been enhanced by technological and organizational developments that could not have been foreseen then. * * * In

---

[6] Under some circumstances, the occupier of land must manifest his desire for privacy. *State v. Dixson/Digby, supra.* Here, defendants had done all that can be expected of them by posting "no trespassing" signs around their property. It would seem silly to require that they display large signs facing the heavens to notify persons in the airspace *not to snoop.*

[7] In his dissenting opinion, Judge Rossman treats this case as if the officers were merely flying over defendants' property and happened to see marijuana plants. That is not so. They had received information that defendants were growing marijuana and were engaged in a purposeful, determined effort, without a warrant, to find it on defendants' property.

deciding whether government practices that make use of these developments are searches, we must decide whether the practice, if engaged in wholly at the discretion of the government, will significantly impair 'the people's' freedom from scrutiny, for the protection of that freedom is the principle that underlies the prohibition on 'unreasonable searches' set forth in Article I, section 9." 306 Or at 171.

There can be no serious doubt that aircraft are technological enhancements that permit man to travel in the airspace and, in the case of helicopters, to hover above the ground. Although Deits, J., dissenting, agrees that aircraft, including helicopters, are technological enhancements, she concludes that the use of a helicopter in this case did not violate defendants' privacy rights, apparently because the police were in the airspace where they had the right to be and their observations "took only a short time." Therefore, she concludes, there was no search, in spite of the facts that the police were "surveilling" defendants' property for marijuana and that the aircraft continued to circle and to hover at lower altitudes to "confirm" the officer's observation. She fails to explain why, if the police may hover over the property for a "short time" to search for marijuana, they may not do it for a longer time and for any reason. To rely on the legality of the officers' observation post in the air is no more valid than it was for the state to rely on the legality of the officers' observation post in *State v. Campbell, supra,* from which the officers received signals from the electronic transmitter they had installed on the defendant's automobile.

As Professor Amsterdam points out in "Perspectives on the Fourth Amendment," 58 Minn L Rev, 349, 403 (1974), the ultimate question is "whether, if the particular form of surveillance practiced by the police is permitted to go unregulated by constitutional restraints, the amount of privacy and freedom remaining to citizens would be diminished to a compass inconsistent with the aims of a free and open society." In our view, the hovering or circling of aircraft at low elevations, when engaged in for the purpose of finding out what is on, or what is happening on, a person's property, would diminish the privacy and freedom of citizens to a point that is inconsistent with the free and open society envisioned by the framers of Oregon's Constitution. It would be a "significant impairment of the people's freedom from scrutiny." *State v. Campbell, supra,* 306 Or at 170.

It is no answer to say, as Judge Deits says, that persons can easily detect aircraft when they are close to their property. Although the ability to detect them might make the intrusion more obvious, it does not make it any less intrusive.

The gist of Judge Rossman's dissenting opinion is that, because searches from the air are effective as an "investigatory tool in the fight against illegal drugs," 95 Or App at 251, we should overlook constitutional technicalities. If that were the test, we should hesitate to invalidate warrantless or general searches and wiretapping, as well as numerous other effective investigatory tools that our constitution prohibits. Judicial intervention, however, is "the instrument by which a free society imposes on itself the seldom welcome, sometimes dangerous, always indispensable restraints that keep it free." Amsterdam, *supra*, 58 Minn L Rev at 353.

Reversed and remanded for a new trial.

**ROSSMAN, J.,** dissenting.

Unless the helicopter flight in this case was a search, defendant's privacy interests cannot have been violated. Clearly, no search occured under the United States Constitution. *Florida v. Riley,* 488 US ___, 109 S Ct 693, 102 L Ed 2d 835 (1989). Moreover, until now, it would have been equally obvious that no search occurred under Oregon's constitution. *See State v. Farkes,* 71 Or App 155, 161, 691 P2d 489 (1984), *rev den* 298 Or 704 (1985). In apparent eagerness to chart new constitutional territory, however, the majority has decided that, within the boundaries of *this* state, it is unconstitutional to use aerial surveillance to find marijuana farms. Because I do not share in the majority's flights of fancy about the meaning of Oregon's constitution, I dissent.

Under Oregon's constitution, the test for whether a protected privacy interest has been violated is "whether the practice, if engaged in wholly at the discretion of the government, will significantly impair 'the people's' freedom from scrutiny." *State v. Campbell,* 306 Or 157, 171, 759 P2d 1040 (1988). Presumably, this test is not a "formula for expressing a conclusion," but rather "a starting point for analysis." *State v. Campbell, supra,* 306 Or at 164. Thus, in determining whether a search has occurred, the court must consider *all* relevant factors, including whether the police activity was purposeful,

whether a property interest is involved, whether the police have used technological devices to enhance their sensory perceptions and whether the police have offended social or legal norms of behavior. Considered properly, these factors make it clear that no search occurred in this case.

The majority appears to contend that, whenever officers engage in a purposeful investigation, they conduct a search. Although certainly purposefulness is an element to be considered, it does not by itself create a search in the constitutional sense. If it did, a game warden could not travel remote county roads looking for illegal game activity; state police could not use radar equipment to ticket speeding motorists; and officers could not look for marijuana plants growing on unposted private land. *See State v. Dixon/Digby,* 307 Or 195, 766 P2d 1015 (1988). Yet, none of those investigative activities is a search under Article I, section 9.

The point is this:

"A privacy interest * * * is an interest in freedom from *particular forms* of scrutiny. The interest is not one of freedom from scrutiny in general, because, if that were the case, any form of scrutiny would infringe a privacy interest and thereby be considered a search." *State v. Campbell, supra,* 306 Or at 170. (Emphasis supplied.)

Moreover, "individual freedom from scrutiny is determined by social and legal norms of behavior, such as trespass laws * * *." 306 Or at 170. Thus, it is not enough for defendant to complain that he was scrutinized. He must show that the particular *form* of scrutiny to which he was subjected is a significant impairment of "the people's" freedom, as evidenced by current law and custom.

The police officers in this case did not offend any legal or social norms when they passed through the public airspaces over defendant's property. On the contrary, they did no more than what any member of the public could do. It is an accepted fact of modern life that our outdoor activities may be observed from a passing aircraft. The majority's characterization of aerial surveillance as a "significant impairment" of our usual freedoms simply ignores current social norms.

Arguing that ancient property rights extended vertically from the bowels of the earth to the billowy heavens

above, the majority does its best to find that the helicopter observation violated some property interest of defendant. It suggests that, although modernly we have had to adjust ancient property rights ideas to the requirements of air commerce, defendant here retains property rights to and in the sky, and aerial surveillance is analogous to trespass or nuisance.

Property owners have no right to exclude either public or private aircraft from flying over their land. Moreover, if followed to its logical conclusion, the majority's trespass analogy would allow police to observe defendant's property from above, so long as they remained outside defendant's invisible property lines as they extend upward into the sky. This argument ignores the fact that we have entered the space age. As interesting as the majority's historical insights may be, they have little to do with the validity of aerial surveillance under Article I, section 9. Defendant's property interests are not implicated here.

Of course, under different circumstances, aerial surveillance could be so intrusive as to constitute a search. For example, a helicopter could be used to harass an individual or to create an actual nuisance. There was no hint of that here, however. The investigation was brief. There is no evidence that it interfered with defendant's use and enjoyment of his property through noise, dust, or threat of injury. *See Florida v. Riley, supra.* The police did not use sophisticated observational equipment, but simply saw the marijuana plants with the naked eye. Given the limited intrusion involved here, no search occurred.

The majority attempts to bolster its conclusion that an aerial surveillance is a search by labeling a helicopter a "technological enhancement." It apparently reasons that, unless officers can reach the place from which they make their observations under their own power, their perceptions are "technologically enhanced" and therefore are intrusive. This approach is an unwarranted extension of *Campbell* and will lead to ridiculous results.

*State v. Campbell, supra,* dealt with the use of a radio transmitter that was attached to the defendant's automobile for surveillance purposes. The court compared the transmitter with the hidden listening device placed on a public telephone

in *Katz v. United States,* 389 US 347, 88 S Ct 507, 19 L Ed 2d 576 (1967). The court noted that, because such devices are difficult to detect, permitting their use would mean that "no movement, no location and no conversation in a 'public place' would in any measure be secure from the prying of the government." 306 Or at 172. *Campbell* and *Katz* are about devices that enhance *sensory perceptions* over what nature has provided. Modern forms of transportation are hardly difficult to detect and do not raise the same concerns as do bugging devices. *Campbell's* concern with technological enhancements does not apply to them.

Moreover, the majority's approach defies common sense. As surely as Icarus could not fly without the aid of feathers and wax, he also could not survive long in the sea below him without a boat. Using the majority's reasoning, police traveling by motorboat on public waterways could not legitimately "scrutinize" illegal activity that occurred in plain view because their presence so far from shore would be "technologically enhanced." Similarly, because police cars arguably "enhance" an officer's ability to observe conduct by allowing them to cover more territory than they could otherwise, under the majority's analysis, we must view with suspicion any reports of conduct unobservable without the aid of a fast automobile. Aircraft, boats and automobiles improve mobility, not sensory perception. A helicopter is no more a "technological enhancement" than are other forms of modern transportation.

In short, the aerial surveillance in this case was purposeful, but that does not end the inquiry. It violated no property right of defendant, and it did not depend on the use of sensory enhancing devices. Most importantly, it did not intrude on any privacy right which society is prepared to recognize. When all the circumstances are considered, no search occurred.

Finally, I am well aware that the Oregon Supreme Court has rejected the federal test for determining whether a search has occurred. Try as it may, however, the court seems unable to escape the fact that a "reasonable expectation of privacy" is relevant to the existence of an Article I, section 9, privacy right. For example, in *State v. Dixon/Digby, supra,* the court based its rejection of the defendants' privacy claims on

the fact that their private property was not fenced and posted so as to manifest an intention to exclude all visitors. Further, the court's recognition in *State v. Campbell, supra,* that legal and social norms define the freedom from scrutiny guaranteed by Article I, section 9, also bears a great resemblance to federal analysis, which measures Fourth Amendment freedoms partly by what society is willing to accept as reasonable. *See Florida v. Riley, supra.*

Both Article I, section 9, and the Fourth Amendment protect only against *unreasonable* searches and seizures and, despite the different nomenclatures used by the courts, the same factors are relevant under both analyses. Considering all of the facts and circumstances, the United States Supreme Court found that helicopter surveillance like that which occurred here does not offend the Fourth Amendment, because it is unreasonable to expect complete privacy from passing aircraft. The same factors make it clear that it also does not violate Article I, section 9.

The only flight that merits concern in this case is the seemingly endless joyride on which some individuals are taking the Oregon Constitution. The direction they take may be intellectually exhilarating; it ignores, however, the proper focus of our inquiry—the reasonableness of police activity. The type of aerial surveillance that occurred in this case is not a search within the meaning of the constitution. It is a reasonable investigatory tool in the fight against illegal drugs. The trial court should be affirmed.

Riggs, J., joins in this dissent.

**DEITS, J.,** dissenting.

The majority concludes that all police use of helicopters at "low elevations"[1] to investigate illegal activities is impermissible, because it invades a person's privacy rights in violation of Article I, section 9, of the Oregon Constitution. In

---

[1] The majority concludes that the elevation of the helicopter was not critical, but notes that, if it was, it would be necessary to remand to the trial court for findings on that point. I do not agree that a remand would be necessary. The defendants' challenge to the accuracy of the affidavit is in the nature of a motion to controvert. Pursuant to ORS 133.693(3), defendants had the burden to establish the inaccuracy of the affidavit. Having denied the challenge to the accuracy of the affidavit, the trial court had no further obligation to make findings of fact.

my view, placing such a severe restriction on this effective investigatory tool is neither compelled by Article I, section 9, nor complementary to Oregon search and seizure law. Although I agree that there are circumstances in which the use of a helicopter may violate protected privacy interests, the use of the helicopter in this case did not. Accordingly, I dissent.

As the majority recognizes, Article I, section 9, protects both property and privacy interests. *State v. Owens,* 302 Or 196, 729 P2d 524 (1986); *see also State v. Dixson/Digby,* 307 Or 195, 766 P2d 1015 (1988). Defendants' property interests were not violated here, because the police did not physically intrude on their property by flying 500 feet above it.[2] The more difficult question is whether the police actions violated defendants' privacy interests. A privacy interest under Article I, section 9, is an interest in freedom from particular forms of scrutiny. *State v. Campbell,* 306 Or 157, 166, 759 P2d 1040 (1988). The majority concludes that the use of helicopters is an unacceptable form of scrutiny:

> "In our view, the hovering or circling of aircraft at low elevations, when engaged in for the purpose of finding out what is on, or what is happening, on a person's property, would diminish the privacy and freedom of citizens to a point that is inconsistent with the free and open society envisioned by the framers of Oregon's Constitution. It would be a 'significant impairment of the people's freedom from scrutiny.' " 95 Or App 240, 246, 770 P2d 58. (Citation omitted.)

In reaching its conclusion, the majority relies heavily on the Supreme Court's conclusion in *Campbell* that the use of a radio transmitter is an impermissible form of scrutiny. That tail-end reliance is misplaced. The lesson in *Campbell* is that the validity of a technologically enhanced surveillance depends on the particular impact that the surveillance has on the person's privacy interests. In contrast to the detailed impact analysis performed in *Campbell,* the majority in this case simply concludes that helicopter surveillances are too intrusive. The majority completely fails to recognize and discuss the significant distinctions between the intrusiveness of radio transmitters and helicopters.

---

[2] I concur in Judge Rossman's conclusion that defendants did not have a property right in the airspace above their property.

In *Campbell,* the court discussed the impact that the use of radio transmitters could have on an individual's privacy interest:

"Any device that enables the police quickly to locate a person or object anywhere within a 40-mile radius, day or night, over a period of several days, is a significant limitation on freedom from scrutiny, as the facts of this case demonstrate. The limitation is made more substantial by the fact that the radio transmitter is much more difficult to detect than would-be observers who must rely upon the sense of sight. Without an ongoing, meticulous examination of one's possessions, one can never be sure that one's location is not being monitored by means of a radio transmitter. Thus, individuals must more readily assume that they are the objects of government scrutiny. Professor Amsterdam and Justice Harlan, among others, have observed that freedom may be impaired as much, if not more so, by the threat of scrutiny as by the fact of scrutiny.

"The problem presented by this case is essentially much like that presented in *Katz,* which was whether using a hidden listening device placed in a public place could be considered a search. Conversations in public may be overheard, but it is relatively easy to avoid eavesdroppers by lowering the voice or moving away. Moreover, one can be reasonably sure of whether one will be overheard. But if the state's position in this case is correct, no movement, no location and no conversation in a 'public place' would in any measure be secure from the prying of the government. There would in addition be no ready means for individuals to ascertain when they were being scrutinized and when they were not. That is nothing short of a staggering limitation upon personal freedom. We could not be faithful to the principles underlying Article I, section 9, and conclude that such forms of surveillance were not searches." 306 Or at 171. (Citations omitted.)

It is clear that the *Campbell* conclusion that the use of radio transmitters is an unacceptable form of surveillance was based on the highly intrusive nature of the device—in particular, the ability it gave police to follow an individual, day or night, anywhere within a 40-mile radius, and the fact that it is extremely difficult for an individual to detect and avoid the use of such a device. The use of aircraft for police surveillance presents an altogether different situation. In contrast to the use of radio transmitters, air traffic is an accepted part of everyday life. As noted by the United States Supreme Court in *Florida v. Riley,* 488 US ___, 109 S Ct 693, 102 L Ed 2d 835,

1989, the use of helicopters in public airways in this country is routine.[3] Individuals commonly observe aircraft overhead, they are aware that their property and person may be observed from the sky, and they can easily detect the presence of airplanes or helicopters when they are close by. Further, unlike the use of a radio transmitter, which by its very nature is always used covertly, the circumstances under which actual surveillance by aircraft may occur will vary considerably.

The majority asserts that it is irrelevant that an individual can detect aircraft flying overhead, but not a radio transmitter surreptitiously planted on his person or his property. That assertion is simply incorrect. As stated by the court in *Campbell:* "The limitation [on freedom from scrutiny] is made more substantial by the fact that the radio transmitter is much more difficult to detect than would-be observers who must rely on the sense of sight." 306 Or at 172. In other words, an individual's knowledge that he is being observed minimizes the seriousness of the intrusion on his privacy because he can take steps to prevent the observation and because the fear of on-going but undetectable scrutiny is not present. Such is the case with aerial surveillance.

The majority opinion attempts to establish a definitive rule as to the permissibility of aerial surveillance by helicopter. Although that may be a laudable objective from the standpoint of providing predictability in law enforcement practices, it is simply impossible to adopt such an all-encompassing rule because of the variety of circumstances under which helicopter surveillance may occur. As the Supreme Court concluded in *State v. Dixson/Digby,* 307 Or 195, 211, 766 P2d 1015 (1988), the determination of whether Article I, section 9, has been violated must often be made on a case-by-case basis:

"Under Article I, section 9 * * *, the question is whether governmental intrusions into privately owned land would significantly impair an individual's interest in freedom from scrutiny, *i.e.,* his privacy. The answer is: That depends."

---

[3] The Supreme Court specifically noted in *Florida v. Riley, supra:*

"The first use of the helicopter by police was in New York in 1947, and today every State in the country uses helicopters in police work. As of 1980, there was 1,500 of such aircraft used in police work. More than 10,000 helicopters, both public and private, are registered in the United States, and there are an estimated 31,697 helicopter pilots." 488 US at ___ n 2.

In my opinion, aerial surveillance generally may occur without violating protected privacy interests. Observations made from fixed-wing aircraft flying over navigable airspace in a nonintrusive manner do not significantly impair an individual's freedom from scrutiny. *See State v. Farkes,* 71 Or App 155, 161, 691 P2d 489 (1984), *rev den* 298 Or 704 (1985). Police making observations from such aircraft are in a place where they have a right to be and, having limited maneuverability, are subject to significant physical and legal restrictions as to the actual conditions of flight. Although those restrictions are not necessarily designed to protect privacy interests, officers who abide by them will seldom intrude impermissibly into the privacy of those on the ground.

Helicopters, however, present additional problems. Apparently, there are no general limitations on the altitudes at which they may fly. *See* 14 CFR § 91.79(d) (1986). Further, their capacity to perform aerial maneuvers with great control and precision makes the privacy interests of those on the ground considerably more vulnerable than is the situation with fixed wing aircraft. Accordingly, to permit the police, when engaged in criminal law enforcement, to use helicopters to the limits of their technical capabilities could destroy the protections that Article I, section 9, was intended to provide. Because of the wide variety of circumstances under which a helicopter might be used, and in the absence of legislative guidance, we are not in a position to draw precise lines between permissible and impermissible uses. Whether aerial surveillance of any nature constitutes a search depends on all the circumstances involved: whether the police were in a place where they had no right to be; whether the intensity and duration of the surveillance, including the altitude and speed of the aircraft, was overly intrusive; whether the aerial observation was undertaken for the sole purpose of looking for illegal activity on defendants' property;[4] whether other

---

[4] *See State v. Slowikowski,* 307 Or 19, 761 P2d 1315 (1988). As noted by Judge Riggs in his separate dissent, the majority incorrectly relies on *Slowikowski* for the proposition that all purposive actions by police constitute searches. As Judge Riggs correctly points out, *Slowikowski* does not hold that every purposive action by a police officer constitutes a search in the constitutional sense. The fact that the use of the helicopter in this case was a "determined official effort" to observe defendants' property does not *automatically* make the police action a search, any more than an inadvertent observation by the police is automatically not a search. Again, whether the police action was a search depends on all the circumstances of the case.

sophisticated equipment was used;[5] and whether the nature and circumstances of the object of the observation are particularly private. *See State v. Dixson/Digby, supra; State v. Owens, supra.*

I would conclude, in this case, that the police action did not constitute a search. Although the aerial surveillance was a determined, official effort to observe illegal drug activities on defendants' property, its intensity and duration were limited. The observations were made from an altitude of approximately 500 feet and took only a short time.[6] Although the officer conducting the surveillance made some additional efforts to confirm his observations, the affidavit used to obtain the warrant did not rely on them, and we need not determine if they violated defendants' rights. The police were in a place they had a right to be; the helicopter was in navigable airspace. No other surveillance equipment was used. Defendants had taken steps to conceal the plants among the trees; however, the trees were 300 feet from the house and would not normally be considered particularly private. I believe that these factors, when considered together, show that there was no significant impairment of defendants' freedom from scrutiny. Accordingly, I would conclude that defendants' Article I, section 9, rights were not violated.[7]

Richardson, Rossman and Riggs, JJ., join in this dissenting opinion.

**RIGGS, J.,** dissenting.

Because the helicopter fly-over in this case was deliberately undertaken "for the express purpose of seeking out the contraband on defendant's property, and was not merely an

---

[5] I do not agree with Judge Rossman's conclusion that a helicopter is not a technological enhancement simply because it does not enhance an officer's sensory perceptions. Just as a high-powered telescope allows an officer to be in a position to observe something he could not otherwise observe, a helicopter puts an officer in a position to make observations he could not make without the use of a helicopter. I agree with Judge Riggs that the fact that a technological enhancement is used is not determinative. Rather, the intrusiveness of the activity is the key issue.

[6] Neither the majority opinion nor the dissents should be construed as establishing 500 feet as a "bright line" between permissible and impermissible observations from helicopters.

[7] I agree with Judge Rossman that, under *Florida v. Riley, supra,* there clearly was no violation of defendants' rights under the Fourth and Fourteenth Amendments.

incidental observation made during a routine flight from one place to another," 95 Or App at 242, the majority concludes that the challenged conduct necessarily constitutes a search subject to the Article 1, section 9, warrant requirement, citing *State v. Slowikowski,* 307 Or 19, 761 P2d 1315 (1988). I disagree. I believe that *State v. Campbell,* 306 Or 157, 759 P2d 1040 (1988), requires us to look beyond the intent of the officers involved and to examine "the nature of the act asserted to be a search[,]" 306 Or at 170, to decide whether the actions of the police fall outside the bounds of what is constitutionally permissible warrantless investigation. Judged by that standard, I would hold that the helicopter inspection in this case was not a search, and I accordingly dissent.

In *Slowikowski,* the police were alerted to the presence of marijuana in a storage locker rented by the defendant after a trained police dog unexpectedly led them to the defendant's locker during a routine training exercise conducted at the storage facility. The Supreme Court held that there was no search because there was no "purposive intrusion into a protected area * * *." 307 Or at 27. The majority relies on the converse of the *Slowikowski* holding—that all purposive intrusions by police constitute searches—in reaching its result, but *Slowikowski* itself cautions against such an interpretation: "[N]ot every purposive action by a police officer is a 'search,' at least in the constitutional sense." 307 Or at 27. Thus, in *Slowikowski,* the officer's deliberate action in smelling for himself the odors emanating from defendant's storage locker was not a search and, likewise, in *State v. Louis,* 296 Or 57, 672 P2d 708 (1983), the police did not conduct a search by deliberately photographing the defendant in his living room from a garage across the street.

Determining that the challenged police conduct is deliberate constitutes only the beginning, and not the end, of the necessary constitutional analysis under Article 1, section 9. *State v. Campbell, supra,* requires that we go on to determine whether the deliberate police conduct, "if engaged in wholly at the discretion of the government, will significantly impair 'the people's' freedom from scrutiny * * *." 306 Or at 171. Judge Deits, in her separate dissent in this case, applies the *Campbell* rule as well, but I write separately to emphasize the impossibility of developing bright-line rules of law that precisely define the scope of the protection afforded by Article I, section

9, notwithstanding the seductive appeal of searching for the definitive test or standard in this complex and fact-dependent area of the law.

In Oregon, analysis of Article I, section 9, rejects the "reasonable expectation of privacy" rule drawn from federal Fourth Amendment jurisprudence, because that rule is conclusory rather than analytical. *State v. Campbell, supra,* 306 Or at 164. Our courts recognize that "the privacy protected by Article 1, section 9, is not the privacy that one reasonably *expects* but the privacy to which one has a *right*[,]" 306 Or at 164 (emphasis in original), and that the Article 1, section 9, privacy interest is one held by "the people" rather than by particular individuals. *State v. Tanner,* 304 Or 312, 320, 745 P2d 757 (1987).

Similarly, it does not help our analysis to label the police activity in question as being characterized by the use of a "technological enhancement" and treating that as a determining factor in deciding whether there was a search. The use of different technological enhancements may be acceptable or unacceptable in differing degrees, while the use of a single technological enhancement may be acceptable in some circumstances and not in others. What does make a difference is the intrusive nature of the activity in question: "The critical question * * * is whether under our system of government, as reflected in the Constitution, we should impose on our citizens the risks of the electronic listener or observer without at least the protection of a warrant requirement." *United States v. White,* 401 US 745, 786, 91 S Ct 1122, 1143, 28 L Ed 2d 453 (1971) (Harlan, J., dissenting). The linchpin of the personal freedoms guaranteed by the Oregon Constitution is the right of "the people" to be free from unwarranted government scrutiny, and it is against the *Campbell* standard, imprecise as it is, that all forms of investigative governmental intrusion, whether aided by technology or not, must be judged. Thus, in *State v. Louis, supra,* police observation and photographic recording of the defendant's public behavior was held not to constitute a search because the defendant's privacy was not thereby invaded, while in *State v. Casconi,* 94 Or App 457, 766 P2d 397 (1988), we suppressed similarly-obtained photographic evidence of similar conduct occurring in a public restroom stall, because the police surveillance "significantly impair[ed] freedom from scrutiny." 94 Or App at 461.

The *Campbell* rule is hardly a model of judicial clarity, but this is an area of the law in which doctrinal rigidity is a handicap rather than a virtue. Only by adopting a flexible approach to search and seizure cases can the courts hope to keep abreast of rapid advances in technology while remaining true to the principles of liberty upon which our constitution is founded. To attempt otherwise is to embark on a fool's errand.

The *Campbell* test, being adaptable to unforseen advances in technology, new applications of existing technology and changes in investigative techniques generally, is preferable to the approach employed by the majority, which would hold all purposeful acts of the police to be searches. The majority's analysis ignores the critical question of whether the police activity in question has created an unreasonable intrusion into peoples' freedom from scrutiny.

I agree with Judge Deits in her dissent, that "[w]hether aerial surveillance constitutes a search depends on all the circumstances involved[,]" 95 Or App at 255, and I believe that she correctly applies the *Campbell* test to the facts of this case in reaching her conclusion that there was no search here.

I dissent.

Rossman and Deits, JJ., join in this dissenting opinion.