Argued and submitted January 30, 1989, affirmed April 18, reconsideration denied July 25, petition for review allowed August 28, 1990 (310 Or 281)

STATE OF OREGON,
*Respondent,*

*v.*

FLOYD LEE CARTER,
*Appellant.*

STATE OF OREGON,
*Respondent,*

*v.*

ALICE MARLENE GRANT,
*Appellant.*

(87030467; CA A47434 (Control), CA A47437)
(Cases Consolidated)

790 P2d 1152

Diane L. Alessi, Deputy Public Defender, Salem, argued the cause for appellants. With her on the brief were Gary D. Babcock, Public Defender, Salem.

Jonathan H. Fussner, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief was Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Before Richardson, Presiding Judge, and Newman and Deits, Judges.

## DEITS, J.

In this consolidated appeal, defendant Carter appeals his conviction for manufacture of a controlled substance, ORS 475.992(1), and defendant Grant appeals her conviction for possession of a controlled substance. ORS 475.992(4). Defendants both assign error to the trial court's denial of their motions to controvert and to suppress evidence obtained pursuant to a search warrant. We affirm.

The search warrant was based on an affidavit by Deputy Sheriff Severns. The affidavit states that he is a deputy in the Linn County Sheriff's office and has been a police officer for eleven years. He had been trained in aerial observation of marijuana and, over the previous two years, had made at least eleven confirmed aerial observations of growing marijuana. The affidavit relates that Severns obtained defendant Carter's address and information concerning power consumption for the residence from Consumer Power, Inc. Its records showed high power consumption by defendants, compared to the previous occupant at that address. A comparison of the period from August through December, 1983, when the previous occupant was at the address, and the same period in 1986, when defendants were there, showed a difference of 24,818 kilowatt hours. Severns was told by Barnes, an employee of the utility company, that, for a house comparable to defendant's,[1] with the usual appliances, the typical monthly consumption would be 2,400 kilowatt hours during peak usage months. The lowest monthly consumption in 1986 was 5,833 kilowatt hours.

The affidavit also relates that Severns had watched the property from an adjacent neighbor's property. The southeast side of the house was approximately fifty to seventy yards from Severns' vantage point. His observations are described in the affidavit:

"I first looked at the window on the southeast side of the residence with the naked eye. I noticed a green reflection in that window. I looked directly east of the window and could not find anything to account for the green reflection.

"I then looked at a window located on the south side of the residence approximately halfway down that side of the house.

---

[1] The property was owned by defendant Carter.

I observed with the naked eye a large amount of green foliage, covering the entire window. Based on the above described training and experience, the color was consistent with marijuana. I then looked at the window with 7x35 binoculars and observed a stem consistent in color and shape with that of a marijuana plant."

The affidavit says that he could find no explanation for the high power consumption and that he talked to the manager of a wholesale indoor nursery who told him that, given the power consumption and size of defendant's residence, a person could not grow a legal commercial product and make a profit.[2]

We first consider the motions to controvert the affidavit. Defendants argue that the affidavit was misleading for a number of reasons. First, they contend that the statement that Severns obtained information from Barnes concerning typical monthly power usage was controverted. We disagree. Barnes did not testify that he did not provide such information, but only that "I may have. I don't recall at this time." Defendants also argue that the affidavit was controverted because it failed to state that Barnes was the power company credit manager and was not an expert on power usage. However, it is not necessary that usage be provided by a power usage expert.

Defendants also contend that Severns' failure to question Barnes as to whether the outbuilding on the property could make a difference in power usage makes the information inaccurate. Defendants presented no evidence that anything in the outbuilding could have made a significant difference in the power usage. The trial court was entitled to find that defendants did not meet their burden on this issue.[3] ORS 133.693.

Defendants also claim that the affidavit was controverted, because they offered evidence that the only plants visible in the windows observed by Severns were house plants and that the green color he observed was a reflection of grass

---

[2] The state conceded that information in the affidavit obtained from a citizen informant was not usable, and that portion was excised.

[3] Defendants also argue that the property had not been completely inspected by the county assessor's office since 1979 and, thus, the assessment information attached to the affidavit is misleading, because it was not up-to-date. Again, defendants presented no evidence that the information was inaccurate.

outside the window. However, there was evidence that Severns had considerable training and experience in identifying marijuana, that he was at a vantage point from which he could see into the windows and that he had made his observations under different weather conditions and at a different location from defendants' witnesses. When factual questions arise on a motion to controvert, we are bound by the trial court's findings of fact, if there is evidence to support them. *State v. Cole,* 78 Or App 450, 454, 717 P2d 221, *rev dismissed* 302 Or 297 (1986). The trial court did not err in denying defendants' motions to controvert.

Defendants also assign as error the denial of their motion to suppress evidence seized during the search. They first contend that Severns' use of binoculars constituted an unlawful search under Article I, section 9, and the Fourth Amendment and that, therefore, any information obtained by the use of binoculars cannot be considered in determining whether a warrant is based on probable cause.

Defendants argue that the use of binoculars was impermissible, because binoculars are a technological enhancement of a police officer's powers to observe. The fact that a particular device is a technological enhancement not contemplated by the drafters of the constitution does not make its use by the police unlawful. In *State v. Campbell,* 306 Or 157, 759 P2d 1040 (1988), the court held that the placement of a radio transmitter on the defendant's car is an impermissible form of surveillance. The court recognized that the government's ability to scrutinize the affairs of people has been significantly enhanced by technological advances, but it did not hold that use of all such enhancements is impermissible. Rather, the test articulated for determining the permissibility of particular forms of scrutiny is:

> "In deciding whether government practices that make use of these developments are searches, we must decide whether the practice, if engaged in wholly at the discretion of the government, will significantly impair 'the people's' freedom from scrutiny, for the protection of that freedom is the principle that underlies the prohibition on 'unreasonable searches' set forth in Article I, section 9." 306 Or at 171.

In determining whether a particular technological device or its use is overly intrusive, the level of sophistication

and the intrusiveness of the device must be considered. In *Campbell*, the court concluded that the use of the radio transmitter was too intrusive:

> "Any device that enables the police quickly to locate a person or object anywhere within a 40-mile radius, day or night, over a period of several days, is a significant limitation on freedom from scrutiny, as the facts of this case demonstrate. The limitation is made more substantial by the fact that the radio transmitter is much more difficult to detect than would-be observers who must rely upon the sense of sight. Without an ongoing, meticulous examination of one's possessions, one can never be sure that one's location is not being monitored by means of a radio transmitter." 306 Or at 171.

The use of moderate power binoculars to observe more clearly or carefully something that was already subject to some scrutiny with the naked eye presents quite a different case. *Campbell* recognizes the distinction:

> "Moreover, it is wrong to characterize the radio transmitter as simply a device for 'enhancing' visual observations in the manner of moderate power binoculars or camera lenses." 306 Or at 166.

The use of binoculars is not an unexpected occurrence in today's society. They are used, not only by law enforcement officers, but by citizens for hunting, spotting game, bird watching and other ordinary, lawful purposes. In addition, in contrast to a radio transmitter or other technological device that an ordinary citizen has little or no ability to detect, citizens have some ability to ascertain that they are being observed and, if they desire, to avoid the scrutiny.

Here, Severns' use of binoculars served only to allow him to observe the plants in the window more carefully and in more detail. They were sitting in the window of the house and could be seen with the naked eye from the adjoining property. Severns' affidavit indicates that he saw, covering the window, a large amount of green foliage, the color of which was consistent with marijuana. The binoculars allowed him to see that the stem of the plant was consistent in shape and color with marijuana. The use of the binoculars was not overly intrusive. We hold that it did not impermissibly impair defendants' freedom from scrutiny and, therefore, did not constitute a warrantless search of the residence.

■ Defendants also contend that the affidavit did not establish probable cause to believe that there was evidence of criminal activity on defendant Carter's property. To have probable cause requires that the information on which the warrant is based be such as could lead a reasonable person to believe that the search will discover things specified in the affidavit in the places requested to be searched. ORS 133.555(2); *State v. Anspach,* 298 Or 375, 380, 692 P2d 602 (1984).

■ In addition to recounting Severns' observations of the plants, the affidavit also states that the power consumption for the property was significantly higher than the average for similar property. Power records revealed that defendants' usage during even the lowest consumption months was more than double the peak usage of a comparable home with typical appliances. The affidavit also says that the power consumption occurred in a manner consistent with marijuana production and that there was no other apparent explanation, such as wiring for heavy duty commercial equipment, to explain the consumption. Although high power consumption alone will not establish probable cause for a search, it may be a factor in determining whether the affidavit as a whole reaches that level. *State v. McBride,* 96 Or App 268, 773 P2d 379, *rev den* 308 Or 184 (1989).

We conclude that Severns' observations, considered together with the unexplained, dramatic increase in power consumption, were sufficient to allow the magistrate to conclude reasonably that evidence of a marijuana growing operation would be found on the premises.

Affirmed.

**RICHARDSON, P. J.,** concurring.

I concur in the decision affirming the judgment. I write separately on the question whether the affiant's use of binoculars constituted a search that was not authorized by a warrant or by some exception to the warrant requirement. Defendants argued the issue under both the federal and state constitutions.

Both the lead opinion and the dissent focus on the type of "technological enhancement" used as the principal relevant consideration. The inquiry may properly include the

character of the device used, but the analysis required is whether a privacy interest, *i.e.,* an interest in freedom from particular forms of government scrutiny, has been violated by the conduct of the government official. *See State v. Campbell,* 306 Or 157, 759 P2d 1040 (1988). If there is no protected privacy interest, then it matters not at all what device the police used to see what a person was doing. For example, if an officer uses a 600 millimeter camera lens from a distance of 500 feet to photograph a man exposing himself on a public street corner, there is no search, because there has been no protected privacy interest violated. *See State v. Louis,* 296 Or 57, 672 P2d 708 (1983).

Certainly a person has a privacy interest in conduct or things within a home. However, a person may sacrifice the privacy interest otherwise available by his own conduct. In that instance, when the conduct is observed, there is no search and no need to address the need for a warrant. In *State v. Louis, supra,* the court held that the defendant had "sacrificed" the "expectation of privacy" of his home when he exposed himself in a window open to public view. There was no search, even though the officers used a camera with a telephoto lens to obtain the evidence.

Although *State v. Campbell, supra,* did not involve the issue of technological enhancement, the court discussed the privacy interest protected by Article I, section 9. It said:

> "One explanation for the absence of a constitutionally protected interest against certain forms of government scrutiny may be the absence of any freedom from those forms of scrutiny in society at large. The reason that the observations of a police officer who is standing in a public place infringe no privacy interest may be that there is no generally recognized freedom from such scrutiny by private individuals. Such observations by the police would thus not significantly reduce the freedom from scrutiny available to 'the people.'" 306 Or at 170.

Although the court eschewed definitions of the right of privacy based on phrases such as "reasonable expectation of privacy" or on concepts of social or legal norms, the opinion suggests some obeisance to what society would be willing to recognize.

In *State v. Dixson/Digby,* 307 Or 195, 766 P2d 1015 (1988), the court, in discussing the privacy protection

accorded the homeowner's land outside the curtilage by Article I, section 9, concluded that, in order to have that privacy, the person must manifest an intention to exclude the public and thereby the government. Although that principle is not readily transferrable to a claim of privacy within a dwelling, it is a symptom of the analysis that the court appears to follow in such cases. If a person in his dwelling conducts his affairs in such a way that they are exposed to the public, he has not manifested a desire for privacy and cannot expect it.

In this case, the plants that the officer saw with his "naked eye" were in the window. Had that window been located five feet from the officer's lawful vantage point, there would have been no question that defendant had, by exposing the plants in the window, "sacrificed" the privacy that the confines of his dwelling seemed to manifest. *See State v. Louis, supra.* In that instance, there would be no generally recognized freedom from scrutiny of the plants in the window by private individuals and, thus, no privacy interest to protect from government view. However, an otherwise unobstructed window may be so far from a public way or other vantage point that the distance can be seen as an objective, if not subjective, manifestation of privacy or, at least, not a forfeiture of it. Conceptually, the person may think that there is no need to hide or screen the activity, because it cannot be seen by the public. There is therefore, in some measure a continuum from obvious view to no view at all.

Applying that analysis, I conclude that defendants, by placing plants in the window so that they could be seen by the officer from his lawful vantage point without binoculars, sacrificed the privacy interest inherent in his dwelling to the extent of what appeared in the window. They may have entertained a hope that no one, especially police officers, would view the window garden, but that is not the same as manifesting a desire for privacy from any or all views. The window was 50 to 75 yards from the property line. The officer, without the aid of binoculars, was able to see the plants and to conclude that their color was consistent with marijuana. The fact that the officer used binoculars to see the stem of the plants and to obtain information to confirm his opinion about the plants does not show that defendants had not forfeited their privacy. The plants were readily visible in the window, and the binoculars enabled the officer to see them in more detail. See *Dow*

*Chemical Co. v. United States,* 476 US 227, 106 S Ct 1819, 90 L Ed 2d 226 (1986). In this context, the use by the officer of binoculars to see more clearly what could be seen with the unaided human eye did not significantly impair defendants' freedom from scrutiny.

**NEWMAN, J.,** dissenting.

The police, without a warrant, trained binoculars on the window of defendants' private home to see what they could not see with the naked eye. In the affidavit supporting the warrant, the police included information that they had obtained by use of the binoculars. The affidavit states that, with his naked eyes, the officer saw a "green reflection" in the window on the southeast side of the residence and a "large amount of green foliage covering the entire window on the south side of the residence * * * the color of which was consistent with marijuana." 101 Or App at 284. The affidavit, however, states that, *with the aid of binoculars,* the officer was able to observe a "stem consistent in color and shape with that of a marijuana plant." 101 Or App at 284.

Only the use of binoculars allowed the officer to see that stem. Use of the binoculars was essential to the issuance of the warrant. It also constituted a search. It was a "determined official effort to see or hear what is not plain to a less determined observer." *State v. Louis,* 296 Or 57, 61, 672 P2d 708 (1983). That warrantless search violated Article I, section 9.

The majority asserts that police use of "moderate power" binoculars does not impair "the people's" freedom from scrutiny. *See State v. Campbell,* 306 Or 157, 171, 759 P2d 1040 (1988). It argues that binoculars are in common use and that a citizen is able to detect when he is being observed. Police use of binoculars to peer into private homes, however, is not a common use, nor is it at all plain just how a citizen would be able to detect that he is being observed. Moreover, as we noted in *State v. Ainsworth,* 95 Or App 240, 247, 770 P2d 58, *rev allowed* 308 Or 158 (1989), although "the ability to detect [a technological enchancement used for scrutiny] might make the intrusion more obvious, it does not make it any less intrusive."

The concurrence argues that the propriety of the use

of the binoculars depends on whether a defendant has manifested an intention to exclude the public. It seems to argue that, by placing foliage in his window accessible to view from a neighbor's land, defendant manifested an intention not to exclude the public from peering into his windows with binoculars. If that argument were adopted, it would allow the police as a regular practice to use binoculars to peer into anyone's home from adjacent property if the occupant had a window garden with foliage of a color consistent with that of marijuana.

Although *State v. Blacker,* 52 Or App 1077, 630 P2d 413 (1981), involves the Fourth Amendment, it is instructive here. A policeman on a public thoroughfare trained a spotting scope on a second story residential window and was able to see a marijuana plant in the defendant's premises. On the basis of those facts, the police obtained a search warrant. The trial court found that the marijuana plant was not visible from the public highway with the naked eye. This court, holding that the search violated the Fourth Amendment, quoted from *U.S. v. Taborda,* 635 F2d 131, 138 (2d Cir 1980):

"The vice of telescope viewing into the interior of a home is that it risks observation not only of what the household should realize might be seen by unenhanced viewing, but also of intimate details of a person's private life which he legitimately expects will not be observed either by naked eye or enhanced vision * * *." 52 Or App at 1080. (Footnotes omitted.)

We also stated:

"The state argues that because defendant did not close the curtain to the window, he thereby forfeited his expectation of privacy. * * * However, where, as here, only an enhanced eye could penetrate, we do not think defendant's failure to draw the curtain should be interpreted as a renunciation of his expectation of privacy. *See U.S. v. Taborda, supra,* 635 F2d at 139; *U.S. v. Kim,* 415 F Supp 1252 (D Hawaii 1976); *People v. Arno,* 90 Cal App 3d 505, 153 Cal Rptr 624 (1979); *see also,* [1] La Fave, [Search and Seizure], § 2.2, 260-61 [1978].

"In sum, we reach the same conclusion as the United States Court of Appeals reached in *Taborda:*

" '* * * [O]bservation of objects and activities inside a person's home by unenhanced vision from a location where the observer may properly be does not impair a

legitimate expectation of privacy. However, any *enhanced* viewing of the interior of a home does impair legitimate expectation of privacy and encounters the Fourth Amendment's warrant requirement unless circumstances create a traditional exception to that requirement.' 635 F2d at 139." 52 Or App at 1081. (Emphasis supplied).

The magistrate here should not have considered the information that the police obtained through the use of binoculars. *See State v. Donahue,* 93 Or App 341, 345, 762 P2d 1022 (1988), *rev den* 307 Or 303 (1989). Without that information, the affidavit does not state probable cause to support the warrant. It only states facts about defendants' power consumption and a description of what the officer could see with his naked eye. High power consumption alone is not enough to establish probable cause. *State v. McBride,* 96 Or App 268, 278, 773 P2d 379, *rev den* 308 Or 184 (1989). A green reflection and visible green foliage do not make up for the deficiency.

I dissent.