Argued and submitted February 27, 1991, affirmed February 26, reconsideration denied July 29, petition for review pending 1992

## STATE OF OREGON,
*Appellant,*

*v.*

## BART DALE WACKER,
*Respondent.*

## (C8904498CR; CA A62171)

826 P2d 1019

Rives Kistler, Assistant Attorney General, Salem, argued the cause for appellant. With him on the briefs were Dave

Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Peter Gartlan, Deputy Public Defender, Salem, argued the cause for respondent. With him on the brief was Sally L. Avera, Public Defender.

Before Buttler, Presiding Judge, and Rossman and De Muniz, Judges.

BUTTLER, P. J.

Rossman, J., specially concurring.

## BUTTLER, P. J.

The state seeks reversal of an order granting defendant's motion to suppress evidence discovered as a result of police observation of defendant with a "starlight scope"[1] and camcorder. The sole issue is whether the enhanced observations made by using the scope constituted a search. We agree with the trial court that it did and affirm.

With the consent of the Aloha Tavern owner, three officers stationed themselves in a darkened, second floor office above the front end of the tavern parking lot. The officers used the scope and a video camcorder to watch the lot for drug activity. The scope enabled the viewer to see clearly at night and is capable of magnifying an image 6.8 times. The camcorder enhanced available light to one lux and magnified an image up to 4 times. The two devices were used independently; the scope was not used to enhance the images observed and photographed with the camcorder.

Because the camcorder was not connected to a monitor, the officers' observations of the activities using that device were limited to what they could see through the viewfinder, a 1-1/2" × 2" screen. At about 11:30 p.m., on January 25, 1989, the officers noticed a car, a Nissan, pull into the lot and park in the darkest part of the lot, 29 feet from where they were stationed. After observing the activities inside the car with the aid of the scope, the officers formed the opinion that the occupants were engaging in criminal drug activity. The observing officers then radioed for a marked patrol car to stop the Nissan after it left the lot. It was stopped and, after a consensual search, evidence of crime was seized. Defendant moved to suppress evidence of the observations made by the officers by using the enhancement devices, as well as the evidence seized at the scene of the stop, because, he contended, the stop was the result of the enhanced observations.

The trial court made these findings:

"14a. It is impossible to tell what activities the deputies observed in the Nissan with the naked eye, what activities

---

[1] The starlight scope is described more completely as the "Star-Tron MK-303A Passive Night Vision System." It is powered by a 2.7 volt battery and its efficiency increases as available light decreases. It costs $5,747.69.

they observed with the use of the starlite scope and what activities they observed through the camcorder viewfinder.

"15. The observations made by the deputies through the viewing screen of the camcorder were insufficient to establish a reasonable suspicion to believe a crime had been committed.

"16. The activities the deputies observed in the Nissan without the use of the starlite scope were not sufficient to establish a reasonable suspicion a crime had been committed, nor to establish probable cause that a crime had been committed and that the occupants of the Nissan were the persons who had committed the crime.

"17. The use of the starlite scope by the deputies to observe activities in the Nissan was an unreasonable intrusion upon the occupants' right to privacy."

The court concluded that the use of the scope constituted a warrantless search and granted defendant's motion to suppress in its entirety. Although the state concedes that the findings are supported by the record, it contends that the use of the scope did not amount to a search. We disagree.

■ A search occurs when a person's privacy rights are significantly impaired. *State v. Campbell*, 306 Or 157, 759 P2d 1040 (1988); *State v. Casconi*, 94 Or App 457, 766 P2d 397 (1988). The state does *not* contend that every use of a starlight scope is permissible. Rather, it argues that, because "the activities in the car were apparent to all who walked by, the incremental loss of privacy resulting from the officer's use of the nightscope cannot be described as a significant impairment." That argument appears to be that defendant had no reasonable expectation of privacy, the test applied in *Katz v. United States*, 389 US 347, 88 S Ct 507, 19 L Ed 2d 576 (1967), under the federal constitution, but rejected as the test under Article I, section 9, in *State v. Campbell, supra*, where the court said:

"Because the phrase continues to appear so often in arguments, we here expressly reject it for defining searches under Article I, section 9. The phrase becomes a formula for expressing a conclusion rather than a starting point for analysis, masking the various substantive considerations that are the real bases on which Fourth Amendment searches are defined. *See, e.g.* Wilkins, *Defining the 'Reasonable Expectation of Privacy': An Emerging Tripartite Analysis*, 40 V and L

Rev 1077 (1987). Moreover, the privacy protected by Article I, section 9, is not the privacy that one reasonably *expects* but the privacy to which one has a *right. See State v. Tanner, supra,* 304 Or at 321 n 7." 306 Or at 164. (Emphasis in original.)

Furthermore, the state's argument is theoretical: There is no evidence that the activities were apparent or visible to anybody other than the officers observing them through the scope. The car was parked in the darkest part of the lot; the video tape shows that, during the 30 minutes of taping, 4 people walked by the car and the occupants were not holding anything up where it could be seen. When a car pulled up behind them, they lowered whatever they were holding to below the window level. Whenever they thought that their activities might be observed, they took steps to avoid being observed. In *Campbell*, the court said:

"But since 1859, when Article I, section 9, was adopted, the government's ability to scrutinize the affairs of 'the people' has been enhanced by technological and organizational developments that could not have been foreseen then. Tiny radio transmitters for surreptitiously locating objects to which the transmitters are attached are among these developments. In deciding whether government practices that make use of these developments are searches, we must decide whether the practice, if engaged in wholly at the discretion of the government, will significantly impair 'the people's' freedom from scrutiny, for the protection of that freedom is the principle that underlies the prohibition on 'unreasonable searches' set forth in Article I, section 9." 306 Or at 171.

Oregon courts have declined to hold that a person has no privacy interest in areas that are accessible to the public. *State v. Campbell, supra; State v. Owczarzak,* 94 Or App 500, 766 P2d 399 (1988); *State v. Casconi, supra,* 94 Or App at 457.

■■ In *State v. Owczarzak, supra,* the police, who were investigating sexual activity in public restrooms, installed two video cameras in "peepholes" so that they could watch what was occurring in and in front of two toilet stalls, which had no doors. We rejected the state's argument that, "because defendant's conduct took place in an area open to the view of others in the restroom, he had no protected privacy interest." 94 Or App at 503. Although the area in which an individual's activities are conducted may affect the

extent of the person's privacy interest, what the person seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected. *State v. Campbell, supra,* 306 Or at 169. Defendant sought to keep his activities private by parking in the darkest corner of the lot, away from the main walkway and by discontinuing them whenever somebody walked by or when a car approached. The state, relying on *State v. Ainsworth,* 310 Or 613, 801 P2d 749 (1990), contends that that makes no difference. However, *Ainsworth* held only that a "police officer's *unaided* observation * * * from a lawful vantage point is not a search under Article I, section 9, * * *." 310 Or at 621.[2] (Emphasis supplied.)

■     Whether the government's use of the technological enhancements involved in this case constitutes a search, therefore, is not determined by whether other police conduct might have resulted in the same discovery, *State v. Owczarzak, supra,* 94 Or App at 503, or solely by reference to the area at which the government conduct is directed, but by whether the surreptitious surveillance itself is a practice that, if engaged in entirely at the government's discretion, would significantly impair the people's freedom from scrutiny. Use of the starlight scope, as used in this case, is such a practice. The device enhances light and magnifies the image, enabling a person to observe in the dark what is otherwise unobservable, substantially impairing personal freedom from scrutiny. The fact that the observation is designed and intended to be undetectable makes the limitation more substantial. "[F]reedom may be impaired as much, if not more so, by the threat of scrutiny as by the fact of scrutiny." *State v.*

---

[2] The court emphasized this point:

"The concept of 'technological enhancement' is not applicable here. Cases involving the use of methods to enhance human perceptual capabilities (*e.g., State v. Slowikowski,* 307 Or 19, 761 P2d 1315 (1988); *State v. Campbell,* 306 Or 157, 759 P2d 1040 (1988); *State v. Louis,* 296 Or 57, 672 P2d 708 (1983); *State v. Faulkner,* 102 Or App 417, 794 P2d 821, *rev den* 310 Or 422 (1990); *State v. Carter/Grant,* 101 Or App 281, 790 P2d 1152, *rev allowed* 310 Or 281 (1990)) are not relevant. There is no evidence that the observations by the sheriff's deputies in this case were made with other than the naked eye. That the observations were made from a helicopter rather than from a mountaintop cannot have constitutional significance. *We do not address the situation where police officers, from a lawful vantage point, make observations with equipment that enhances their perceptual capabilities.*" *State v. Ainsworth, supra,* 310 Or at 618 n 5. (Emphasis supplied.)

*Campbell, supra,* 306 Or at 172.[3] Although a person in defendant's position might anticipate that passersby might peer into his car, he could never be certain, even under cover of darkness, that his activities are not being monitored.

The enhanced, surreptitious surveillance by the police significantly impaired defendant's right to be free from scrutiny and, therefore, constituted a warrantless search. Accordingly, the evidence obtained as a result of the surveillance and the stop was properly suppressed.

Affirmed.

**ROSSMAN, J.,** specially concurring.

I agree with the result that the majority reaches but believe that it should have been reached more directly. Instead of simply relying on the trial court's findings, the majority appears to use this as an opportunity to denounce any use of nightscopes. Although it notes that use of the scope was unconstitutional "as used in this case," I am concerned that its *dicta* will be misinterpreted as rendering impermissible the use of nightscopes in all cases.

The state concedes that "there is evidence to support the trial court's finding that, without the nightscope, the officers would not have observed sufficient activity to form a reasonable suspicion that defendant and his companions possessed drugs." The only other question is whether defendant's activities were viewable by passersby, in which case defendant could not argue that the state's observations impaired his constitutional right to freedom from scrutiny. The trial court's findings and conclusions implicitly settle that issue in defendant's favor, and we are bound by that.

---

[3] The court elaborated in *Campbell*:

"The problem presented by this case is essentially much like that presented in *Katz*, which was whether using a hidden listening device placed in a public place could be considered a search. Conversations in public may be overheard, but it is relatively easy to avoid eavesdroppers by lowering the voice or moving away. Moreover, one can be reasonably sure of whether one will be overheard. But if the state's position in this case is correct, no movement, no location and no conversation in a 'public place' would in any measure be secure from the prying of the government. There would in addition be no ready means for individuals to ascertain when they were being scrutinized and when they were not. That is nothing short of a staggering limitation upon personal freedom. We could not be faithful to the principles underlying Article I, section 9, and conclude that such forms of surveillance were not searches." 306 Or at 172.

Because the officers did not make an unaided observation that could have given rise to reasonable suspicion that the vehicles' occupants were committing a crime, and because the court tacitly found that others in the tavern parking lot would have been unable to observe defendant's activities, the stop was unlawful. That should have ended our inquiry.

I write separately to clarify that, although use of the nightscope was impermissible in this case, its use is not *per se* unlawful. Under other circumstances, it might lawfully be used to observe that which could not otherwise be seen. For example, if an officer had probable cause to believe that a violent crime was being committed in a darkened stadium, the nightscope could be used to identify the exact location of the assailant or to keep the suspect in view during hot pursuit. Its use would also be permissible if officers had probable cause to believe that drugs were being sold and used a nightscope to identify the precise type of drug. *See* 1 LaFave, *Search and Seizure* § 2.2(c), at 339 (2d ed 1987 & 1991 Supp). These are but a few examples of the circumstances in which use of a nightscope could be appropriate.