Argued and submitted March 2, decision of the Court of Appeals reversed; order of the circuit court suppressing evidence reversed and case remanded to the circuit court for further proceedings August 19, reconsideration denied October 26, 1993

## STATE OF OREGON,
*Petitioner on Review,*

*v.*

## BART DALE WACKER,
*Respondent on Review.*

(CC C8904498CR; CA A62171; SC S39421)

856 P2d 1029

Rives Kistler, Assistant Attorney General, Salem, argued the cause for petitioner on review. With him on the petition were Charles S. Crookham, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Peter Gartlan, Deputy Public Defender, Salem, argued the cause for respondent on review. With him on the response was Sally L. Avera, Public Defender, Salem.

Thomas J. Crabtree, of Crabtree & Rahmsdorff, Defense Services, Inc., Bend, filed a brief for *amicus curiae* Oregon Criminal Defense Lawyers Association.

VAN HOOMISSEN, J.

Fadeley, J., filed a specially concurring opinion.

## VAN HOOMISSEN, J.

Defendant was charged with unlawful possession of a controlled substance (cocaine). ORS 475.992. Before trial, he moved to suppress the state's evidence, arguing that the seizure of the evidence was "tainted" by an unlawful search. The trial court ordered the evidence suppressed. The Court of Appeals affirmed. *State v. Wacker*, 111 Or App 483, 826 P2d 1019 (1992). We allowed the state's petition for review. The dispositive issue is whether the police "searched" a car in which defendant was a passenger. For the reasons that follow, we hold that, because the police did not invade defendant's protected privacy interest, no search occurred.[1] Accordingly, we reverse and remand to the trial court.

The owner of a tavern was concerned about illegal drug activity around his business. He requested police assistance. With the owner's permission, police officers stationed themselves in a second floor office above the tavern to watch for drug activity.[2] The officers used a "starlight scope"[3] and a video camcorder[4] to record their observations. The two devices were used independently of each other.

About 11:30 p.m., defendant and Deborah Weare drove into the tavern's parking lot in Weare's Nissan car. Weare was driving. She parked directly behind the tavern, six parking spaces from the side of the parking lot bounded by the side street. The officers' second floor vantage point was 29 feet from the car.

As the night went on, the number of other cars in the lot increased. About 10 to 15 other cars were in the lot while

---

[1] This court originally allowed review in this case to consider whether police use of a starlight scope and a camcorder is a "search" under Article I, section 9, of the Oregon Constitution. For the reasons explained in this opinion, we find that not to be the determinative factor in this case.

[2] The tavern sits on a corner lot. A side street runs along one side of the tavern parking lot, which is located behind the tavern. The parking lot is separated from the side street by a small grass strip. There is a back entrance to the tavern near the side street.

[3] The Smith and Wesson Star-Tron MK-303A Passive Night Vision System is referred to as a "starlight scope." It magnifies images and enables the user to see better in the dark.

[4] The officers' observations using the camcorder were limited to what they could see through its viewfinder.

defendant and Weare were there. Other patrons of the tavern walked near Weare's car to enter the tavern. Two people stopped as they passed the car, motioned to the people inside the car and, apparently, engaged in conversation with them. Defendant and Weare stayed inside the car for several minutes before entering the tavern.

About 30 minutes later, defendant and Weare came out of the tavern with a third person; all three of them got into the car. Someone turned on the console or overhead car light, which remained on part of the time that the three people were inside the car.

After observing the activities inside the car, the officers formed an opinion that the people in the car were engaging in criminal drug activity. The officers then radioed other officers to stop the car after it left the parking lot. ORS 131.615.[5] It was stopped and, after a consensual search,[6] evidence of crime was seized. Defendant and Weare were charged with unlawful possession of a controlled substance.[7]

Before trial, defendant moved to suppress the evidence on the ground that the use of the starlight scope and the camcorder to observe activity within Weare's car was an illegal search and that, without the information obtained by use of those devices, there was no basis for the subsequent stop and search of the car and its occupants. Accordingly, defendant argued, any evidence seized was "tainted" and must be suppressed. Defendant relied on Article I, section 9, of the Oregon Constitution, and the Fourth Amendment to the Constitution of the United States.

The trial court found in part:

"5. Deputy Watson observed the occupants of the Nissan handling a vial, placing the vial to their noses, bending down and sniffing, handing items to each other and

---

[5] ORS 131.615(1) authorizes a peace officer who reasonably suspects that a person has committed a crime to stop the person and, after informing the person that he or she is a peace officer, make a reasonable inquiry. Defendant does not argue that the officers lacked sufficient information reasonably to suspect that the occupants of the car were committing a crime.

[6] Defendant does not challenge the trial court's finding that the search of Weare's car after the stop was consensual.

[7] Weare subsequently pleaded guilty to a misdemeanor.

reaching into the console of the auto. Watson also observed the female scraping a substance off a mirror-like object and licking the residue.[8]

"6.  Deputy Watson observed the Nissan at times with the naked eye and at times with the starlite scope.

"7.  While the Nissan was at the [tavern] parking lot being observed by Deputies Mathews and Watson, the driver and passenger of the Nissan got out of the vehicle at least once. At one time a third party, a female, got into the vehicle, with the passenger and the driver with the driver's and passenger's consent. The third party sat in the back seat. A light was on in the Nissan at times. This was a dome light or a map light. Other unknown persons were in proximity to the Nissan at times during the deputies' observations.

"8.  The camcorder recorded these observations and statements made by the three deputies as they were observing the Nissan.[9] The deputies' statements included a running account of what they could and could not see. It is unclear whether the deputies speaking are observing the Nissan with their naked eye, or by use of the starlite scope or through the camcorder.

---

8 At the suppression hearing, Deputy Watson testified:

"Q  [BY PROSECUTOR]: "[W]hen you first saw the Nissan Sentra pull into the parking lot, what did you notice about it, if anything?

"A  [BY DEPUTY WATSON]: There was a female driver, a male passenger in the front seat.

"Q:  And they parked the car in the lot there?

"A:  That's correct.

"Q:  And did they get out of the vehicle immediately or what did they do?

"A:  No. They stayed in the vehicle. They both put something to their noses and plugged the other nostril and appeared to sniff something and placed whatever it was they sniffed out of into the center console.

"Q:  Did you see — were they holding anything when they were doing this or can you describe what it was that you saw in more detail?

"A:  Well, we saw something. I guess it would be — appeared to be a vial, something along that line. It was placed to the nose area. One nostril was plugged and, again, appeared to be sniffed and then passed to the other person and same process took place and it was placed in the center console.

"Q:  And this observation, was it made with your unaided eye or were you using the starlite scope?

"A:  I believe it was with the naked eye."

9 Defendant offered the video tape in evidence, and it was received without objection from the state.

"9. The video tape made by Deputy Watson using the camcorder was very similar to what Deputy Watson could see with the naked eye. The image is magnified by the camcorder lens, however the image is grainier than the human eye perceives.

"10. Deputies Kuni, Watson and Mathews have considerable experience in investigating drug cases and are familiar with drug related activities.

"11. After observing the activities in the Nissan, the deputies formed the opinion that there was criminal drug activity occurring in the Nissan.

"12. The deputies radioed for a marked patrol unit to stop the Nissan as it left the [tavern] lot.

"13. Washington County Sheriff's Office Deputy Alan Julian followed the Nissan * * * and stopped the Nissan by blocking the Nissan with his unit.

"14. It is impossible to tell what activities the deputies observed in the Nissan with the naked eye, what activities they observed with the use of the starlite scope and what activities they observed through the camcorder viewfinder."

The trial court ordered that "everything the officers observed with the starlight scope must be suppressed." The court also ordered that "any evidence obtained from the stop and consensual search of the Nissan must also be suppressed as it is tainted by the illegal search." The court's oral remarks suggest that it based its ruling on Article I, section 9, and *State v. Campbell*, 306 Or 157, 759 P2d 1040 (1988).

The Court of Appeals affirmed, holding that the police surveillance "significantly impaired defendant's right to be free from scrutiny and, therefore, constituted a warrantless search." *State v. Wacker, supra*, 111 Or App at 489. The Court of Appeals' decision also appears to have been based on Article I, section 9, and *State v. Campbell, supra*. We allowed the state's petition for review.

■ We first consider defendant's arguments under Article I, section 9.[10] Article I, section 9, of the Oregon Constitution, provides in part:

---

[10] Defendant raises no issue of statutory law. *See State v. Campbell*, 306 Or 157, 162, 759 P2d 1040 (1988) ("Before deciding a federal claim, we must first consider and decide all questions of state law.").

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure * * *."[11]

In *State v. Owens*, 302 Or 196, 206, 729 P2d 524 (1986), this court stated that "[a] 'search' occurs when a person's privacy interests are invaded." In *State v. Louis*, 296 Or 57, 60, 672 P2d 708 (1983), this court noted: "The first issue to determine is did the defendant exhibit an intention to protect his privacy?" In *State v. Campbell, supra*, this court explained:

"[T]he privacy protected by Article I, section 9, is not the privacy that one reasonably *expects* but the privacy to which one has a *right*." 306 Or at 164 (emphasis in original) (citing *State v. Tanner*, 304 Or 312, 321-22 n 7, 745 P2d 757 (1987)).

■■ The privacy interests protected from unreasonable searches under Article I, section 9, are defined by an objective test of whether the government's conduct "would significantly impair an individual's interest in freedom from scrutiny, *i.e.*, his privacy." *State v. Dixson/Digby*, 307 Or 195, 211, 766 P2d 1015 (1988) (analyzing privacy interests in unimproved land outside the curtilage of a home). If no privacy interest is implicated, no "search" has occurred under Article I, section 9.

In *State v. Louis, supra*, 296 Or at 61, this court stated:

"[N]ot everything that police officers see or hear one do in private quarters requires a search warrant. The question is when observation (or listening) becomes a 'search' within the legal meaning of that term. Persons may conduct themselves in otherwise protected areas in such a way that their words or acts can plainly be seen or heard outside without

---

[11] This court has analyzed Article I, section 9, in a different way than the federal analysis under the Fourth Amendment, which focuses on an individual's reasonable expectations of privacy. As this court has noted, "if subjective expectations were determinative of privacy rights, 'the government could diminish each person's subjective expectations of privacy merely by announcing half-hourly on television * * * that we were all forthwith being placed under comprehensive electronic surveillance.' " *State v. Tanner*, 304 Or 312, 321-22 n 7, 745 P2d 757 (1987) (quoting Amsterdam, *Perspectives on the Fourth Amendment*, 58 Minn L Rev 349, 384 (1974)). Whether or not a particular person expects to be free from observation, therefore, is not relevant to an analysis under the Oregon Constitution: "Rights under section 9 are defined not by the privacy one expects but by the privacy one has a right to expect." *Id.*

any special effort. One would not, for instance, expect police to obtain a search warrant to charge violation of a noise ordinance against sounds emanating from private premises. An indecent exposure in a window opening to public view is not very different."

*See also State v. Rhodes*, 315 Or 191, 197, 843 P2d 927 (1992) (opening door of car that was stopped with its motor running was search); *State v. Dixson/Digby, supra*, 307 Or at 204-08 (discussing distinction between privacy interests within the curtilage of a home and outside the curtilage); *State v. Campbell, supra*, 306 Or at 172 (attaching tracking device to car violated Article I, section 9); *State v. Kosta*, 304 Or 549, 555, 748 P2d 72 (1987) (opening car trunk was a search); *State v. Owens, supra*, 302 Or at 206 (containers that by their very nature announce their contents do not support a cognizable privacy interest under Article I, section 9); *State v. Jackson*, 296 Or 430, 438, 677 P2d 21 (1984) ("An officer who has lawfully stopped a vehicle does not violate any occupant's rights in walking around the vehicle and looking through the windows of the vehicle to observe that which can be plainly seen."); *State v. Holt*, 291 Or 343, 347-49, 630 P2d 854 (1981) (because the defendant had no actual or subjective expectation of privacy from observation, police observations were not a search).

■■ The threshold question in any Article I, section 9, search analysis is whether the police conduct at issue is sufficiently intrusive to be classified as a search. No search occurs unless the police invade a protected privacy interest. If the police conduct is not a search within the meaning of Article I, section 9, this court will not reach the issue of whether the conduct was unreasonable. *State v. Ainsworth*, 310 Or 613, 616, 801 P2d 749 (1990).[12]

■■ Defendant here chose to carry out his activities in the parking lot of a tavern that was open for business. Patrons of the tavern were passing regularly within a few feet of Weare's

---

[12] Defendant has focused most of his arguments on the officers' method of observation. Citing *State v. Campbell, supra*, he argues that using *any* technological enhancement *automatically* violates Article I, section 9, regardless of whether the conduct that the officers observed was open to public view. Defendant misreads *Campbell*. That case did not purport to establish a *per se* rule against the warrantless use by police of any technologically enhanced observation regardless of the circumstances.

car. Defendant also chose to carry out his activities in a car with its console or overhead light on. That light made the interior of the car and Weare visible to passersby, as well as to the officers who were stationed only 29 feet away. No privacy interests of defendant were invaded here and, thus, there was no search while the car was parked in the tavern's parking lot. The open-to-the-public nature of defendant's and Weare's location and activities in a lighted car in a tavern parking lot during business hours establishes that no goverment conduct significantly impaired defendant's privacy. *State v. Dixson/ Digby, supra*, 307 Or at 211. It follows that, because the officers did not invade defendant's protected privacy interest, there was no search within the meaning of Article I, section 9. The police observations were sufficient to create a reasonable suspicion of criminal activity.

We proceed to consider defendant's claim under the Fourth Amendment. The Fourth Amendment provides in part:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated * * *."

The Fourth Amendment has been interpreted as protecting privacy interests under what has become known as the *Katz* "reasonable expectation of privacy" test.[13] That test involves two questions: first, whether the individual has shown that he or she seeks to preserve something as private; second, whether the individual's expectation of privacy is "one that society is prepared to recognize as 'reasonable.' "

---

[13] In *Katz v. United States*, 389 US 347, 88 S Ct 507, 19 L Ed 2d 576 (1967), the Supreme Court held that an unreasonable search occurred when government agents attached an electronic listening device to a public telephone booth from which the defendant regularly placed calls.

Other jurisdictions that have considered facts similar to those found here have concluded that no "reasonable expectation of privacy" existed. *See, e.g., State v. Wong*, 68 Haw 221, 708 P2d 825, 828 (1985) (officer's observation through binoculars of a defendant in a lighted car in a supermarket parking lot did not violate either the state or federal constitution, because the defendant had a diminished expectation of privacy); *State v. Abislaiman*, 437 So 2d 181, 183 (Fla App) (the defendant had no reasonable expectation of privacy in a hospital parking lot where he was seen by a security officer through a video camera), *rev den* 449 So 2d 264 (Fla 1983), *cert den* 469 US 833 (1984); *State v. Jones*, 33 Wash App 275, 653 P2d 1369, 1370 (1982) (use of binoculars to view what is otherwise visible violates neither the Fourth Amendment nor its counterpart in the Washington Constitution), *rev den* 99 Wash 2d 1003 (1983).

*United States v. Knotts*, 460 US 276, 281, 103 S Ct 1081, 75 L Ed 2d 55 (1983) (quoting *Katz v. United States*, 389 US 347, 361, 88 S Ct 507, 19 L Ed 2d 576 (1967) (Harlan, J., concurring)).[14] "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *United States v. Katz, supra,* 389 US at 351.[15]

The Supreme Court also had said that there is a diminished expectation of privacy inside a car:

"One has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as a repository of personal effects. A car has little capacity for escaping public scrutiny. It travels public thoroughfares where both its occupants and

---

[14] In *United States v. Knotts, supra*, the Supreme Court held that the warrantless use of a beeper to trace an automobile to the defendant's property where a search with a warrant discovered illegal drug laboratory did not violate the Fourth Amendment, which does not prohibit police from augmenting their sensory faculties.

[15] 1 LaFave, Search and Seizure 339-40, § 2.2(c) (2d ed 1987), states:

"Under the *Katz* expectation of privacy test, particular attention must be given to the nature of the place at which the observed objects or activities are located, for this will bear directly upon whether there was a justified expectation of privacy as to those objects or activities. Perhaps the easiest situation with which to deal is that in which the incriminating evidence or conduct is seen out in the open, whether in a public place or on private property. It may sometimes be true that in this situation the defendant can honestly say that he had an actual expectation of privacy, at least in the sense that he was confident there was no one in such immediate proximity as to be able to detect the incriminating character of those objects or activities with the naked eye. But under *Katz* the expectation must be justified; it must be one, as Justice Harlan helpfully put it, 'that society is prepared to recognize as "reasonable." '

"Under this particular balancing of privacy and law enforcement interests, it is submitted, Fourth Amendment restrictions should not be imposed when the police have done no more than: (1) use binoculars to observe more clearly or carefully that which was in the open and thus subject to some scrutiny by the naked eye from the same location; or (2) use binoculars to view at a distance that which they could have lawfully observed from closer proximity but for their desire not to reveal the ongoing surveillance. When this is the nature of the police conduct vis-a-vis evidence or conduct located in the open, the assistance provided by the binoculars should not be characterized as a search. Fully consistent with *Katz*, therefore, are those holdings that it is not a search to make a binocular observation of the gathering of marijuana in an open field, bookmaking activity on the street, drug sales on the street or in a car, the loading or unloading of contraband from a vehicle which is in the open, the markings on a truck parked at the rear of defendant's premises abutting a public golf course, or the characteristics of a marijuana plant which was on a sun deck and visible from a neighbor's yard. This is not to suggest, however, that the use of binoculars to look into a curtilage is never a search." (Footnotes omitted.)

its contents are in plain view." *United States v. Knotts, supra,* 460 US at 281 (quoting *Cardwell v. Lewis,* 417 US 583, 590, 94 S Ct 2464, 41 L Ed 2d 325 (1974)).

*See Texas v. Brown,* 460 US 730, 740, 103 S Ct 1535, 75 L Ed 2d 502 (1983) ("There is no legitimate expectation of privacy * * * shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers.").[16]

■ We conclude that whatever expectation of privacy that defendant may have had while he was engaged in activities in a lighted car in the parking lot of a tavern open to the public, viewed objectively, that expectation was not reasonable. We hold that the observations made by the police did not constitute a search within the meaning of the Fourth Amendment.

In summary, we conclude that defendant's privacy rights under Article I, section 9, and the Fourth Amendment were not violated. We hold that no search occurred while the car was in the tavern's parking lot. The officers reasonably suspected that the occupants of the car were committing a crime and, therefore, the stop was lawful. The ensuing consensual search was valid.

The decision of the Court of Appeals is reversed. The order of the circuit court suppressing the evidence is reversed. The case is remanded to the circuit court for further proceedings.

**FADELEY, J.,** specially concurring.

I concur in the result but write separately to plainly state the points essential to that result. The police stopped a

---

[16] *See also Florida v. Riley,* 488 US 445, 450-51, 109 S Ct 693, 102 L Ed 2d 835 (1989) (observations by police from helicopter did not violate any reasonable expectation of privacy and, therefore, did not violate Fourth Amendment); *California v. Greenwood,* 486 US 35, 39-40, 108 S Ct 1625, 100 L Ed 2d 30 (1988) (the defendants' expectation of privacy in their garbage bags was not objectively reasonable); *Dow Chemical Co. v. United States,* 476 US 227, 236-38, 106 S Ct 1819, 90 L Ed 2d 226 (1986) (use of sophisticated camera did not constitute a search because Dow had a diminished privacy interest in the areas surrounding its business); *California v. Ciraolo,* 476 US 207, 213-14, 106 S Ct 1809, 90 L Ed 2d 210 (1986) (no search occurred when police flew over the defendant's property and saw marijuana within the curtilage of the home).

vehicle that contained defendant. The operator and defendant consented to a search of the vehicle. Evidence was seized in that consent search.

The police stop was based on reasonable suspicion and was therefore lawful in and of itself. However, the grounds for reasonable suspicion were gained by police who were conducting visual observation of the interior of the automobile that contained defendant.

The automobile, with defendant in it, was located in the partially lighted parking lot of a tavern. Most of the time that police observations were occurring, an interior light was on in the automobile. The officer testified that he made what he believed was an observation with his naked eye of persons in the vehicle plugging one nostril and sniffing something from a vial or container in the other nostril. The substance being sniffed was being passed around from person to person.

Various persons passed close by the automobile and one was taken by defendant or his companion from the tavern to the interior of the automobile. These persons, inside and outside the vehicle, could easily see what the police saw from a second-story window located 29 feet from the automobile. Other cars came into the lot and parked, so that a total of 10 to 15 other vehicles, besides that containing the defendant, were in the lot.

The police were present at the request and suggestion of the owner of the second-story window and the tavern beneath it. The owner was suspicious that persons in the automobile were dealing illegal drugs at his tavern's parking lot.

Because the defendant and others were doing the above-described suspicious activities within view of other people in the area who could observe their conduct by the naked eye, the police observation of the conduct did not invade privacy so as to become an illegal search. *State v. Owens*, 302 Or 196, 206, 729 P2d 524 (1986); *State v. Louis*, 296 Or 57, 60-61, 672 P2d 708 (1983). Everything the officer saw with the naked eye could be and was seen from outside the car, and could be seen without any extra effort such as opening a door or trunk lid.

These observations were a sufficient basis for reasonable suspicion to support the stop of the car that was followed by a consensual search that discovered the evidence at issue. Suppression should not have been ordered as to that evidence.

The reasonable expectation of privacy required to support a Fourth Amendment claim is also obviously lacking concerning the observations. Defendant exposed his conduct to public view in a public place, peopled from time to time by a number of other persons obviously in a position to observe what defendant and his companions were doing, as defendant would have been aware. That is all that needs to be said to dispose of the Fourth Amendment contention. *Texas v. Brown*, 460 US 730, 740, 103 S Ct 1535, 75 L Ed 2d 502 (1983).

I concur in the result; suppression of the evidence obtained from the consensual search, following a stop based on grounds for reasonable suspicion not unlawfully obtained, was error.