Argued and submitted March 31, reversed and remanded August 13, 2008

## STATE OF OREGON,
*Plaintiff-Appellant,*

*v.*

## CASEY WALTER WARREN,
*Defendant-Respondent.*

Washington County Circuit Court
C060026CR; A132634

191 P3d 722

Gregory A. Rios, Assistant Attorney General, argued the cause for appellant. On the brief were Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Anna M. Joyce, Assistant Attorney General.

Laura A. Frikert, Deputy Public Defender, argued the cause for respondent. With her on the brief was Peter Gartlan, Chief Defender, Legal Services Division, Office of Public Defense Services.

Before Edmonds, Presiding Judge, and Brewer, Chief Judge, and Wollheim, Judge.

EDMONDS, P. J.

**EDMONDS, P. J.**

■■    This is a state's appeal in a criminal case. *See* ORS 138.060(1)(c) (providing for state's appeal from pretrial order suppressing evidence). The state argues that the trial court erred in granting defendant's motion to suppress evidence obtained during an interaction between police officers and defendant. We review pretrial orders suppressing evidence for legal error, and we are bound by the trial court's findings of historical fact if they are supported by evidence in the record. *State v. Ehly*, 317 Or 66, 74-75, 854 P2d 421 (1993). Under *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968), "if findings are not made on all factual issues and there is evidence from which such facts could be decided in more than one way, we will presume that the factual issues were decided in a manner consistent with the trial court's ultimate conclusion." *State v. Forrest*, 213 Or App 151, 160, 159 P3d 1286 (2007). For the reasons explained below, we reverse and remand.

At about 9:30 p.m. on an evening in December 2005, King City Police Officer Rinell and her partner Officer Robinson noticed a pickup truck parked outside a Coffee Time coffee shop in a strip mall. The pickup was parked in the parking lot on the side of the Coffee Time building, which had been burglarized a few weeks before. As she drove by, Rinell noticed that a person was in the pickup and that the person was leaning or slumped over. Rinell parked the patrol car near the pickup, never activating the patrol car's siren or lights. The patrol car was parked in such a manner that the pickup was not blocked in and could be driven away.

Rinell and Robinson walked up to the pickup, with Rinell on the driver's side and Robinson on the passenger's side of the vehicle. Rinell saw defendant leaning over toward the steering wheel with his head down. Robinson testified that defendant was "slumping slightly" and that he "seemed a little disheveled." Rinell tapped on the driver's side window to get defendant's attention. It seemed to take defendant a couple of seconds to focus on her. Rinell thought that defendant might be under the influence of "something" or that he might have a "medical issue," and she became concerned for

his welfare. Defendant then partially opened the door to communicate with Rinell. In response to her inquiry, defendant identified himself. Eventually, Rinell asked defendant to get out of the pickup.

In the meantime, Robinson was shining his flashlight into the cab of the pickup from the other side. He did so, following standard procedure, "to make sure there [was] no kind of weapons or anything else in the vehicle for [his] safety and for [his] partner's safety." As he was illuminating the pickup's cab, he noticed a "small white sandwich bag in the ashtray." When he saw the package with the white substance in it, he believed, based on his training and experience, that it was more likely than not that the baggie contained a controlled substance.

The parties dispute when Robinson communicated his observation to Rinell. Robinson testified that he told Rinell about the baggie of white powder while she was talking with defendant, who was seated in the driver's seat. Rinell testified, "I believe I asked [defendant] if he was all right and right when I did that is when Officer Robinson got my attention. There wasn't a lot of conversation before Officer Robinson got my attention and advised me of some other issues [referring to the baggie]."

On cross-examination, however, defense counsel confronted Rinell with some portions of her police report that appeared to be inconsistent with her testimony. In the report, Rinell noted that she asked defendant to get out of the pickup. Immediately following that notation, she noted, "*At this time*, Officer Robinson told me that there was a small bagg[ie] in the ashtray." (Emphasis added.) When defense counsel asked about the chronology, Rinell responded that the two statements should have been "flip-flopped," and that she was confident that Robinson had told her about the baggie before she asked defendant to get out of the vehicle. On redirect examination, Rinell testified that Robinson's observation of the baggie was "fairly immediate of when we first walked up to the truck."

Rinell also testified that, while defendant was still seated in the pickup, she asked him if there was anything in

the pickup that she should be concerned about. He responded, "Yes, cocaine." Although defense counsel did not challenge that aspect of Rinell's testimony, on redirect examination, Rinell again testified that defendant told her that he had cocaine before defendant got out of the pickup. At that point, Rinell asked defendant to get out of the vehicle.

After asking defendant to get out of the vehicle, Rinell asked him to step to the back of the pickup, where she placed him in handcuffs. Rinell asked defendant if he had anything else in the vehicle that she should be concerned about, and he responded that he had a Taser in his backpack. Rinell placed defendant in the back of the patrol car. Rinell then asked defendant if she could search his vehicle, and he consented to the search. After she searched the pickup, she seized the baggie and field tested its contents; the test revealed that the powder was cocaine, and that result was confirmed by later laboratory testing. Rinell then returned to the patrol car, where she read *Miranda* warnings to defendant. Later, when they were at the police station, defendant admitted to using cocaine and stated that the baggie they had seized had cost him about $30. Defendant was charged by information with possession of a controlled substance.

Pretrial, defendant moved "for an Order suppressing the seizure of any and all evidence obtained as the result of an unlawful stop, including the seizure of any controlled substances and all oral derivative evidence." In his memorandum in support of the motion, defendant argued,

> "When Officer Rinell asked defendant to exit his vehicle, he was stopped. When Rinell approached the defendant and asked for his identification, she did so without any reasonable suspicion that defendant had committed a crime as required by ORS 131.615.[1] In doing so, Rinell unlawfully stopped and detained defendant. During this unlawful encounter, Rinell asked defendant a number of incriminating questions without the benefit of *Miranda*, and sought consent to search his vehicle. Robinson also conducted a

---

[1] ORS 131.615(1) provides: "A peace officer who reasonably suspects that a person has committed or is about to commit a crime may stop the person and, after informing the person that the peace officer is a peace officer, make a reasonable inquiry."

non-consensual search when he looked into the cab of defendant's truck without defendant's permission.

"The discovery of controlled substances in defendant's truck, and the subsequent statements made by defendant, are inextricably linked to the unlawful stop. Because the evidence derives from the preceding illegality, defendant's consent was gained solely as a product of that prior illegality. Having exploited the unlawful stop to gain consent to search defendant's property, the evidence must be suppressed."

The court held a hearing at which the evidence set out above was adduced.

Following the hearing, the court and the prosecutor engaged in the following colloquy:

"[THE COURT]: I think there was that stop when she asked him to get out of the car. I think that the statement by Officer Robinson concerning, 'I see some baggies in the ashtray.' That's—you know I don't know when that was made. Whether it was made before or afterwards, the—after she asked him to get out of the car.

"[PROSECUTOR]: You Honor, I just—I apologize. But both officers clearly testified that that was made after.

"[THE COURT]: But in her report though there was a difference there and I think that the report indicated that it was made afterwards as I recall. On her report?

"[PROSECUTOR]: Your Honor, it's not clear. There's just a series of statements that she makes.

"[THE COURT]: Mm-hmm.

"[PROSECUTOR]: It's not written in such a way that first this happened and then that happened.

"[THE COURT]: Yeah.

"[PROSECUTOR]: But Officer Robinson clearly testified that he made the statement first and then that she asked the suspect to get out of the car. I asked him that pointedly and that's how he answered that question.

"[THE COURT]: So, that's the stop anyway. I mean there is that stop there at that point when she asked him to get out.

"I think that the other issue is the consent issue and I think that was the police exploited that situation. That there was, it was—they asked for his consent after he was taken into custody. I mean he was clearly in custody at that point and I think that the police officer should have given him his *Miranda* rights first before she asked for consent. I think that there was like I said that exploitation.

"You know, this simple stop turns into—has multiple types of issues. I believe that the police violated his rights. So they violated the search and seizure statute, some laws, and so I'm going to suppress it, so. Okay?

"* * * * *

"[PROSECUTOR]: Your Honor, in case this is something that we choose to appeal, I am asking the Court what very specifically are you finding that they—are you finding that then this was then not, at any point, an encounter, this was a stop from the beginning?

"[THE COURT]: I think it was. He clearly had a right to be where he was. The business was open. The car appeared to be parked in a legal way in the parking lot. I think they were investigating. They were clearly investigating this particular vehicle before they even had any contact with the defendant.

"* * * * *

"[THE COURT]: But my ruling is that I think that when they—when she asked him to get out of the car, it became a stop.

"[PROSECUTOR]: And the State is not disagreeing with you on that issue, Your Honor, I'm just trying to be clear then. Are you finding that there was not legal reason prior to the officer asking the defendant to get out of the vehicle for them to have searched or seized that vehicle? That you found that there was no open view, that there was no inevitable discovery, that there was no automobile exception, and there's no community care taking exception? Is that what this Court's finding?

"[THE COURT]: Yeah. I think it was an unlawful seizure of the evidence. I think the defendant was put in a situation where he should have been given his *Miranda* rights before they asked for consent to search his vehicle. I think

that there was an exploitation of that situation by the police officers."

The court granted defendant's motion to suppress. We understand the trial court's rationale for its ruling to be that, when Officer Rinell asked defendant to get out of the pickup, that stop was not supported by reasonable suspicion and it therefore was illegal. The court's discussion of *Miranda* and the officer's request for consent to search suggests that it believed that the state exploited the illegal stop to ask for defendant's consent to search and that, because he was not given *Miranda* warnings before that request, the exploitation "chain" was not broken. *See State v. Hall*, 339 Or 7, 20-29, 115 P3d 908 (2005) (explaining exploitation of illegal police conduct to gain consent to search).

On appeal, the state makes two alternative arguments in support of its position that the trial court erred in granting defendant's motion to suppress:

"First, the trial court's ruling ignored the inescapable fact that the cocaine was in open view in the ashtray of defendant's car and that, after seeing the cocaine in open view, the officers developed probable cause to arrest defendant. Consequently, the officers were entitled to seize that evidence incident to defendant's arrest and defendant's consent—the basis for the trial court's ruling—was superfluous. Second, the trial court misapplied *Hall* and its progeny by not requiring defendant to demonstrate a minimal factual nexus between any illegality and the discovery of the evidence. Here, that connection is completely absent."

Defendant makes four arguments in response. First, defendant asserts, the trial court based its decision on the alternative basis that the officers illegally stopped defendant at the time of their initial contact. Because the state does not challenge that basis for the court's decision, defendant claims, it cannot prevail on appeal. In defendant's view, the officers stopped defendant when they initially made contact with him. Second, defendant asserts, there is evidence in the record to support what defendant characterizes as the court's implicit finding that Robinson did not tell Rinell about the baggie of cocaine until after she had stopped defendant by asking him to get out of the pickup. Given that finding, according to defendant, the officers did not have reasonable

suspicion to support their stop. Defendant's third argument is that the record demonstrates that the officers exploited the claimed illegal stop to obtain defendant's consent to search, resulting in the seizure of the baggie of cocaine. Fourth, defendant argues that, in any event, Officer Robinson conducted an illegal search when he shined his flashlight into defendant's pickup at the beginning of the encounter.

As in the legal analysis of many police-citizen encounters, this case requires us to determine when during the encounter, if at all, defendant was stopped. It also requires us to determine whether any of the police conduct that occurred before the search to which defendant consented was a "search" in the constitutional sense and, if so, whether it was subject to an exception to the warrant requirement. We begin with basic principles. Article I, section 9, of the Oregon Constitution provides, in part, that "[n]o law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure * * *." Under Article I, section 9, a police officer conducts a search if she intrudes on a person's protected privacy interest. *State v. Rhodes*, 315 Or 191, 196, 843 P2d 927 (1992). Government action amounts to a search if "the practice, if engaged in wholly at the discretion of the government, will significantly impair 'the people's' freedom from scrutiny, for the protection of that freedom is the principle that underlies the prohibition on 'unreasonable searches' set forth in Article I, section 9." *State v. Campbell*, 306 Or 157, 171, 759 P2d 1040 (1988) (footnote omitted); *accord State v. Wacker*, 317 Or 419, 425, 856 P2d 1029 (1993). "One indication of whether a government action intrudes on a person's privacy right is whether a private individual would offend social and legal norms of behavior by engaging in the same kind of intrusion." *State v. Portrey*, 134 Or App 460, 464, 896 P2d 7 (1995). A stop—which is a seizure of the person under Article I, section 9—occurs when a police officer temporarily restrains a person's liberty. *State v. Holmes*, 311 Or 400, 406-07, 813 P2d 28 (1991); *see* ORS 131.605(6) (defining a stop as a "temporary restraint of a person's liberty by a peace officer lawfully present in any place").

We begin by applying the foregoing principles to the initial contact between the officers and defendant. As noted,

defendant argues that the state cannot prevail on appeal, because it does not challenge the trial court's alternative basis for its decision that defendant was illegally stopped when Officers Rinell and Robinson initially contacted him. First, we do not read the record to support defendant's view that the court alternatively based its decision on that ground. It is true that, in response to the prosecutor's question regarding the basis for its decision, the court appeared to agree with the suggestion that it was ruling that a stop occurred immediately ("I think it was"). But the court almost immediately clarified that that was not the basis for its ruling: "But *my ruling is* that I think that when they—when she asked him to get out of the car, it became a stop." (Emphasis added.) The state's failure to challenge the trial court's earlier statement is not fatal to its appeal.

In any event, defendant was not stopped when the police officers initially contacted him.

> "[A] 'seizure' of a person occurs under Article I, section 9, of the Oregon Constitution (a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) whenever an individual believes that (a), above, has occurred and such belief is objectively reasonable in the circumstances."

*Holmes*, 311 Or at 409-10 (footnote omitted). Not all police-citizen encounters are seizures. Here, the officers approached defendant's pickup without using the overhead lights on their patrol car, with no weapons drawn, and without blocking the pickup in with their patrol car. They did not significantly restrict defendant's liberty or freedom of movement; their initial contact was not a stop.

Nor was Officer Robinson's observation of the inside of defendant's pickup a search for constitutional purposes. In *State v. Orlovski*, 146 Or App 632, 933 P2d 976 (1997), we explained,

> "It is well settled that a police officer's unaided observation, purposive or not, from a lawful vantage point is not a search under Article I, section 9, of the Oregon Constitution. Moreover, the Supreme Court has held that

> " '[a]n officer who has lawfully stopped a vehicle does not violate any occupant's rights in walking around the vehicle and looking through the windows of the vehicle to observe that which can be plainly seen.' *State v. Jackson*, 296 Or 430, 438, 677 P2d 21 (1984); *see also State v. Wacker*, 317 Or 419, 426-27, 856 P2d 1029 (1993) (holding that no privacy interest was invaded when the officers saw the defendant's activities while he was parked in a tavern parking lot and seated in a vehicle with the console light on)."

*Id.* at 636-37 (internal quotation marks and some citations omitted). In *Wacker*, a case involving a conviction for possession of cocaine, the court considered whether officers' use of a "starlight scope" to watch people in a tavern parking lot at night constituted a "search" for Article I, section 9, purposes. The court concluded that it was not:

> "Defendant here chose to carry out his activities in the parking lot of a tavern that was open for business. Patrons of the tavern were passing regularly within a few feet of [the] car. Defendant also chose to carry out his activities in a car with its console or overhead light on. That light made the interior of the car * * * visible to passersby, as well as to the officers who were stationed only 29 feet away. No privacy interests of defendant were invaded here and, thus, there was no search while the car was parked in the tavern's parking lot. The open-to-the-public nature of defendant's * * * location and activities in a lighted car in a tavern parking lot during business hours establishes that no government conduct significantly impaired defendant's privacy. It follows that, because the officers did not invade defendant's protected privacy interest, there was no search within the meaning of Article I, section 9."

317 Or at 426-27 (citation omitted). More directly relevant here, in *State v. Faulkner*, 102 Or App 417, 419, 794 P2d 821, *rev den*, 310 Or 422 (1990), a police officer

> "shined his flashlight into the cab of [a] pickup and saw a vial of white powder on the seat. He believed it to be cocaine and seized it. [The officer] testified that he was using the flashlight in the process of writing his notes and that he shined it in the pickup, because it was 'a real nice looking Chevrolet pickup that was modified and customed.' "

Explaining that, "[h]ad the observation been made during the daytime, or in some other situation where reliance on the flashlight was unnecessary, there would be no question but that [the officer's] action would not have been a 'search,' " this court held that, "[u]nder these circumstances, use of the flashlight to see what was otherwise in plain view did not significantly impair defendant's freedom from scrutiny and was, therefore, not a search in the context of Article I, section 9." *Id.* at 420-21; *see also State v. Evans*, 101 Or App 340, 790 P2d 1177 (1990) (use of flashlight not a search); *State v. Crook*, 93 Or App 509, 762 P2d 1062 (1988) (evidence of stolen property observed through open car window was admissible as plain view observation). Defendant was neither stopped nor subject to a search by the officers' initial actions.

■ Having determined that no search or seizure took place before Rinell asked defendant to get out of the pickup, we turn to the state's argument that, because Officer Robinson saw the baggie of cocaine in open view, the officers were entitled to search the pickup incident to arrest and to seize the cocaine.[2] Here, even before Rinell asked defendant to step out of the pickup, both she—because defendant told her about the cocaine—and Robinson—because he saw the cocaine—had probable cause to arrest defendant for possession of a controlled substance. That is so regardless of when Robinson told Rinell about his observation. Because they had probable cause to arrest defendant, the officers could perform a search incident to arrest.

■ As the court explained in *State v. Pollock*, 337 Or 618, 622-23, 102 P3d 684 (2004),

> "A warrantless arrest is appropriate if a police officer has probable cause to believe that a person has committed a felony. ORS 133.310(1)(a). Probable cause to arrest must be based on 'a substantial objective basis for believing that more likely than not an offense has been committed and a person to be arrested has committed it.' ORS 131.005(11). From a constitutional perspective, two components comprise probable cause: '[a]n officer must subjectively believe that a crime has been committed and thus that a person or

---

[2] The state does not contest the trial court's ruling that defendant was stopped when Officer Rinell asked him to step out of the pickup.

thing is subject to seizure, and this belief must be objectively reasonable in the circumstances.' *State v. Owens*, 302 Or 196, 204, 729 P2d 524 (1986)."

(Footnote omitted.) "Under Article I, section 9, there are three valid justifications for a search incident to lawful arrest: to protect the officer's safety, to prevent the destruction of evidence, and to discover evidence relevant to the crime for which the defendant was arrested." *State v. Hoskinson*, 320 Or 83, 86, 879 P2d 180 (1994). Moreover, a search may be considered to be "incident to arrest" even though it preceded the arrest. *State v. Anfield*, 313 Or 554, 561, 836 P2d 1337 (1992); *State v. Jacobs*, 187 Or App 330, 333, 67 P3d 408 (2003).

The record is clear that, after Robinson's observation and defendant's statement to Rinell that he had cocaine, both officers had a substantial objective basis for believing that more likely than not defendant had committed the felony of possession of a controlled substance. Defendant was not arrested until Rinell placed him in handcuffs, and the search of the pickup took place incident to that arrest.[3] The officers' search for evidence relevant to the crime for which defendant was arrested was justified as a search incident to arrest, one of the exceptions to the warrant requirement.

■ ■ Two points follow analytically from our conclusion that the officers had probable cause to arrest defendant even before he was asked to step out of the pickup. First, because they had probable cause to arrest defendant, they also had reasonable suspicion to stop him. *See* ORS 131.605(5) (" 'Reasonably suspects' means that a peace officer holds a belief that is reasonable under the totality of the circumstances existing at the time and place the peace officer acts as authorized in ORS 131.605 to 131.625."); *State v. Valdez*, 277 Or 621, 628, 561 P2d 1006 (1977) (The reasonable suspicion standard is "intended to be less than the standard for probable cause * * *."). Thus, the stop was legal and there was no "preceding illegality" that would require an exploitation

---

[3] ORS 133.005(1) provides: " 'Arrest' means to place a person under actual or constructive restraint or to take a person into custody for the purpose of charging that person with an offense. A 'stop' as authorized under ORS 131.605 to 131.625 is not an arrest."

analysis under *Hall*. Second, it is irrelevant whether defendant's consent was obtained illegally because, as the state argues, in light of the other justification for the search, the consent was "superfluous."

In sum, without conducting a search of the pickup or a seizure of defendant, the officers observed cocaine in open view. That observation—and defendant's admission that he had cocaine—justified defendant's arrest and the search incident to arrest. Because the officers did not violate defendant's rights during the encounter, none of the evidence that defendant sought to suppress should have been suppressed.

Reversed and remanded.